686 S.E.2d 135 (2009)
In the Matter of J.D.B.
No. 190A09.
Supreme Court of North Carolina.
December 11, 2009.
Roy Cooper, Attorney General, by LaToya B. Powell, Assistant Attorney General, for the State.
Lisa Skinner Lefler, Wilmington, for juvenile-appellant.
S. Hannah Demeritt, Durham, Barbara Fedders, and Mark Dorosin, Chapel Hill, for the University of North Carolina School of Law Center for Civil Rights, University of *136 North Carolina School of Law Juvenile Justice Clinic, Office of the Juvenile Defender, and Advocates for Children's Services, Legal Aid of North Carolina, amici curiae.
NEWBY, Justice.
This case presents the issue of whether a juvenile who made incriminating revelations to law enforcement officers was in police custody such that the officers should have afforded him the protections of N.C.G.S. § 7B-2101(a), which codifies and expands for the juvenile context the safeguards set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Because we hold that the Court of Appeals properly concluded that the juvenile was not in custody when he incriminated himself, we affirm the decision of that court.
Two juvenile petitions were filed against the juvenile J.D.B. on 19 October 2005, each alleging one count of breaking and entering and one count of larceny. On 1 December 2005, counsel for J.D.B. filed a motion to suppress certain statements and evidence. After a hearing, the trial court entered an order denying the motion to suppress on 13 December 2005. The trial court did not make findings of fact or conclusions of law at that time. In a transcript of admission filed on 24 January 2006, J.D.B. admitted to all four counts alleged in the juvenile petitions of 19 October 2005, but renewed his objection to the denial of his motion to suppress. Also on 24 January 2006, the trial court entered an order adjudicating J.D.B. delinquent. J.D.B. appealed, inter alia, the denial of his motion to suppress.
The Court of Appeals remanded in pertinent part "to allow the trial court to make the findings of fact necessary to support its determination that [J.D.B.] was not in custody at the time he was questioned." In re J.B., 183 N.C.App. 299, 644 S.E.2d 270, 2007 WL 1412457, at *5 (2007) (unpublished). On remand, the trial court entered an order on 16 October 2007 in which it made findings of fact and conclusions of law in support of its denial of J.D.B.'s motion to suppress. The trial court found as follows:
1. On September 24, 2005, [two homes in Chapel Hill] were broken into and various items were stolen, including jewelry [and] a digital camera.
2. [J.D.B.], at the time 13 years old, was interviewed by police on the same day as the break-ins after he was seen behind a residence in the same neighborhood.
3. It was later that the police were informed that [J.D.B.] had been seen in possession of a digital camera at school, which camera turned out to be the camera stolen [on September 24, 2005].
4. Investigator Joseph DiCostanzo of the Chapel Hill Police Department was assigned the investigation and went to the juvenile's school to speak with him.
5. [J.D.B.] is in the seventh grade and enrolled in special education classes.
6. [J.D.B.] was escorted from his class and into a conference room to be interviewed. Present in the room were Investigator DiCostanzo, Assistant Principal David Lyons, a school resource officer and an intern. The door was closed, but not locked.
7. [J.D.B.] was not administered Miranda warning[s] and was not offered the opportunity to speak to a parent or guardian prior to the commencement of questioning. Additionally, no parent or guardian was contacted prior to [J.D.B.]'s removal from class.
8. Investigator DiCostanzo asked [J.D.B.] if he would agree to answer questions about recent break-ins. [J.D.B.] consented.
9. [J.D.B.] stated that he had been in the neighborhood looking for work mowing lawns and initially denied any criminal activity.
10. Mr. Lyons then encouraged [J.D.B.] to "do the right thing" and tell the truth.
11. The investigator questioned him further and confronted him with the fact that the camera had been found.

*137 12. Upon [J.D.B.]'s inquiry as to whether he would still be in trouble if he gave the items back, the investigator responded that it would be helpful, but that the matter was still going to court and that he may have to seek a secure custody order.
13. [J.D.B.] then confessed to entering the houses and taking certain items together with another juvenile.
14. The investigator informed [J.D.B.] that he did not have to speak with him and that he was free to leave. He asked him if [he] understood that he was not under arrest and did not have to talk with the investigator.
15. [J.D.B.] indicated by nodding "yes" that he understood that he did not have to talk to the officer and that he was free to leave. He continued to provide more details regarding where certain items could be located.
16. [J.D.B.] wrote a statement regarding his involvement in the crime.
17. The bell rang signaling the end of the day and [J.D.B.] was allowed to leave to catch his bus home.
18. The interview lasted from 30 to 45 minutes.
19. The investigator had informed [J.D.B.] that he would see him later and would be speaking to his grandmother and aunt.
20. Investigator DiCostanzo and Officer Hunter went to the home of [J.D.B.], but found no one home. When [J.D.B.] arrived, he told the officers they could look around and he would show them where the jewelry was located.
21. Investigator DiCostanzo informed [J.D.B.] that he needed to obtain a search warrant and left Officer Hunter to wait outside [J.D.B.]'s home.
22. While awaiting the search warrant, [J.D.B.] brought a ring to the officer from inside the home.
23. Upon the investigator's return with the warrant, [J.D.B.] entered the home with the officers and handed them several stolen items and led the investigator to where other items could be found on the roof of a gas station down the road. During the entire time that the officers were at his residence and travelling with him to the BP station, no parent or guardian was contacted or advised of the situation. [J.D.B.] was not advised of his Miranda warnings or told he had the right to speak to or have a parent or guardian present.
24. Investigator DiCostanzo left his card and a copy of the search warrant at [J.D.B.]'s residence.
25. All of [J.D.B.]'s responses to the officer's questions were appropriately responsive, indicating that he was capable of understanding the fact that he did not have to answer questions.
26. All of [J.D.B.]'s responses to counsel during the suppression hearing were appropriately responsive.
J.D.B. again appealed the denial of his motion to suppress. The Court of Appeals affirmed the decision of the trial court, concluding that "J.D.B. was not in custody during his interactions with officers." In re J.D.B., ___ N.C.App. ___, ___, 674 S.E.2d 795, 800 (2009). J.D.B. then appealed as of right to this Court on the basis of the dissenting opinion in the Court of Appeals, which would have held that J.D.B. was in custody when he incriminated himself to police officers. Id. at ___, 674 S.E.2d at 801 (Beasley, J., dissenting). The dissenting judge opined, "[T]hat J.D.B. was a middle school aged child is certainly among the circumstances relevant to" whether J.D.B. was in custody. Id. at ___, 674 S.E.2d at 802 (citing State v. Buchanan, 353 N.C. 332, 339-40, 543 S.E.2d 823, 828 (2001)).
We begin our review by noting that the trial court's findings of fact are uncontested and therefore, binding on this Court. E.g., Koufman v. Koufman, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (citations omitted). Our consideration is limited to de novo review of the trial court's conclusions of law. State v. Wilkerson, 363 N.C. 382, 430, 683 S.E.2d 174, 203 (2009) (citing State v. Hyatt, 355 N.C. 642, 653, 566 S.E.2d 61, 69 (2002), *138 cert. denied, 537 U.S. 1133, 123 S.Ct. 916, 154 L.Ed.2d 823 (2003)).
J.D.B. argues that he was in police custody when he incriminated himself and thus, that his rights were violated when he was interrogated without proper warnings under Miranda and N.C.G.S. § 7B-2101(a). The United States Supreme Court held in Miranda
that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the [Fifth Amendment] privilege against self-incrimination is jeopardized .... [The individual] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.
384 U.S. at 478-79, 86 S.Ct. at 1630, 16 L.Ed.2d at 726 (emphasis added). For the juvenile setting, our General Statutes codify and enhance the protections required under Miranda:
(a) Any juvenile in custody must be advised prior to questioning:
(1) That the juvenile has a right to remain silent;
(2) That any statement the juvenile does make can be and may be used against the juvenile;
(3) That the juvenile has a right to have a parent, guardian, or custodian present during questioning; and
(4) That the juvenile has a right to consult with an attorney and that one will be appointed for the juvenile if the juvenile is not represented and wants representation.
N.C.G.S. § 7B-2101(a) (2007) (emphasis added).
The protections of Miranda and section 7B-2101(a) apply only to custodial interrogations by law enforcement. "`[I]n determining whether a suspect [is] in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.'" Buchanan, 353 N.C. at 338, 543 S.E.2d at 827 (second alteration in original) (quoting State v. Gaines, 345 N.C. 647, 662, 483 S.E.2d 396, 405, cert. denied, 522 U.S. 900, 118 S.Ct. 248, 139 L.Ed.2d 177 (1997)). This inquiry requires application of "an objective test as to whether a reasonable person in the position of the defendant would believe himself to be in custody or that he had been deprived of his freedom of action in some significant way." State v. Greene, 332 N.C. 565, 577, 422 S.E.2d 730, 737 (1992) (citations omitted). Notably, the inquiry as to "`whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest,'" Buchanan, 353 N.C. at 338, 543 S.E.2d at 827 (quoting Gaines, 345 N.C. at 662, 483 S.E.2d at 405), is not equivalent to the broader "free to leave" test that "has long been used for determining, under the Fourth Amendment, whether a person has been seized," id. at 339, 543 S.E.2d at 828 (emphasis added) (citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980)). "Circumstances supporting an objective showing that one is `in custody' might include a police officer standing guard at the door, locked doors or application of handcuffs." Id. at 339, 543 S.E.2d at 828.
The uniquely structured nature of the school environment inherently deprives students of some freedom of action. However, the typical restrictions of the school setting apply to all students and do not constitute a "significant" deprivation of freedom of action under the test set forth in Greene. 332 N.C. at 577, 422 S.E.2d at 737. For a student in the school setting to be deemed in custody, law enforcement must subject the student to "`restraint on freedom of movement'" that goes well beyond the limitations that are characteristic of the school environment in general. Buchanan, 353 N.C. at 338, 543 S.E.2d at 827 (quoting Gaines, 345 N.C. at 662, 483 S.E.2d at 405).
In the instant case, J.D.B. was escorted from class to a conference room, where Investigator *139 DiCostanzo was present along with an assistant principal, one of the assistant principal's interns, and the school resource officer. The school resource officer's minimal participation in the questioning of J.D.B. did not render that questioning custodial in nature. See In re W.R., 363 N.C. 244, 248, 675 S.E.2d 342, 344 (2009) (stating in circumstances similar to those in the instant case: "[W]e are not prepared ... to conclude that the presence and participation of the school resource officer ... rendered the questioning of respondent juvenile a `custodial interrogation,' requiring Miranda warnings and the protections of N.C.G.S. § 7B-2101."). Moreover, there is no indication in the trial court's findings that J.D.B. was restrained in any way or that anyone stood guard at the conference room door. "The door was closed, but not locked." By asking J.D.B. "if he would agree to answer questions about recent break-ins," Investigator DiCostanzo indicated that J.D.B. was not required to do so. Investigator DiCostanzo began his questions only after J.D.B. said he was willing to answer. After J.D.B. "initially denied any criminal activity," Investigator DiCostanzo informed J.D.B. that the stolen digital camera had been recovered. J.D.B. then asked "whether he would still be in trouble if he gave the items back," and Investigator DiCostanzo responded that, although the matter was "going to court" regardless, J.D.B.'s cooperation "would be helpful." It was then that J.D.B. "confessed to entering the houses and taking certain items together with another juvenile." Upon objective consideration of the totality of the circumstances surrounding J.D.B.'s confession, we determine that there were not sufficient "indicia of formal arrest" to justify a conclusion that J.D.B. "had been formally arrested or had had his freedom of movement restrained to the degree associated with a formal arrest." Id. (citing Buchanan, 353 N.C. at 338-40, 543 S.E.2d at 827-28).
Immediately following J.D.B.'s initial confession, Investigator DiCostanzo "informed [J.D.B.] that he did not have to speak with him and that he was free to leave. He asked him if [he] understood that he was not under arrest and did not have to talk with the investigator," and J.D.B. "indicated by nodding `yes' that he understood." After J.D.B. acknowledged that he understood he was not under arrest and was free to leave, J.D.B. continued to provide information about the break-ins and "wrote a statement regarding his involvement in the crime." After the interview, which "lasted from 30 to 45 minutes," J.D.B. left the conference room without hindrance. See Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977) (per curiam) (in which the Supreme Court of the United States determined that a suspect was not in custody when his freedom to leave the police station to which he had come voluntarily was not "restricted in any way" and the suspect "did in fact leave the police station without hindrance"). Later that same day, Investigator DiCostanzo and another police officer accompanied J.D.B. as he willingly located and surrendered numerous stolen items. The trial court's findings of fact with respect to this later encounter (numbered 19-24) contain insufficient indicia of "`restraint on [J.D.B.'s] freedom of movement of the degree associated with a formal arrest'" to support a conclusion that J.D.B. was in police custody. Buchanan, 353 N.C. at 338, 543 S.E.2d at 827 (quoting Gaines, 345 N.C. at 662, 483 S.E.2d at 405).
J.D.B. argues, as did the dissenting judge in the Court of Appeals, that the inquiry into whether he was in custody should take into consideration J.D.B.'s age and his status as a special education student. This Court has not accounted for such matters in conducting the proper custody inquiry in the past. In the recent case of In re W.R., for example, we considered whether the questioning of a fourteen-year-old juvenile was custodial in nature. 363 N.C. at 246-48, 675 S.E.2d at 343-44. In reversing the Court of Appeals' holding that the juvenile was in custody, we applied the objective "reasonable person" standard, id. at 248, 675 S.E.2d at 344 (citing Buchanan, 353 N.C. at 338-40, 543 S.E.2d at 827-28), and at no point did we consider the juvenile's age.
We reiterate that the custody inquiry is "an objective test as to whether a reasonable person in the position of the defendant would believe himself to be in custody or that he *140 had been deprived of his freedom of action in some significant way." Greene, 332 N.C. at 577, 422 S.E.2d at 737 (citations omitted). While "[w]e have consistently held that a defendant's subnormal mental capacity is a factor to be considered when determining whether a knowing and intelligent waiver of rights has been made," State v. Fincher, 309 N.C. 1, 8, 305 S.E.2d 685, 690 (1983) (emphasis added) (citations omitted), subjective mental characteristics are not relevant regarding whether "a reasonable person" would believe he had been placed under the equivalent of a formal arrest, Greene, 332 N.C. at 577, 422 S.E.2d at 737 (emphasis added). This Court adheres to the view that "the custody inquiry states an objective rule designed to give clear guidance to the police, while consideration of a suspect's individual characteristicsincluding his agecould be viewed as creating a subjective inquiry." Yarborough v. Alvarado, 541 U.S. 652, 668, 124 S.Ct. 2140, 2151-52, 158 L.Ed.2d 938, 954 (2004) (citing Mathiason, 429 U.S. at 495-96, 97 S.Ct. at 714, 50 L.Ed.2d at 719).[1] Under the circumstances of the case sub judice, we decline to extend the test for custody to include consideration of the age and academic standing of an individual subjected to questioning by police.
Because we conclude that J.D.B. was not in custody when he incriminated himself to the police, we hold that he was not entitled to the protections of N.C.G.S. § 7B-2101(a) and Miranda v. Arizona. The Court of Appeals did not err in affirming the trial court's denial of J.D.B.'s motion to suppress. Therefore, the decision of the Court of Appeals is affirmed.
AFFIRMED.
Justice BRADY dissenting.
The issue in this case is whether J.D.B., a thirteen-year old special education student at Smith Middle School in Chapel Hill, North Carolina, was significantly deprived of his freedom of movement and thus entitled to the protections of the Fifth Amendment of the United States Constitution and N.C.G.S. § 7B-2101(a) before being interrogated by law enforcement officers and school officials in a closed conference room of the middle school. The majority's conclusion stands in stark contrast to our State's public policy of aiding, supporting, and protecting juveniles. The manner in which school officials and law enforcement interrogated J.D.B. more resembles hunters carefully and selectively targeting their prey than a fair juvenile investigation consistent with our General Statutes. Because I believe the Juvenile Code affords heightened protections against self-incrimination to juveniles, especially in the restrictive environment of a public middle school, I respectfully dissent.
Tension has long existed between the interests of law enforcement in conducting efficient criminal investigations and the individual's constitutional right against self-incrimination. Throughout American history the "incommunicado" nature of police investigations has led to the use of physical violence and psychological coercion to elicit criminal confessions. See Miranda v. Arizona, 384 U.S. 436, 445-46, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In response to these abuses, the Supreme Court of the United States decision in Miranda v. Arizona unequivocally established that law enforcement officers must administer specific warnings "to protect an individual's Fifth Amendment right against self-incrimination in the inherently compelling context of custodial interrogations by police officers." State v. Buchanan, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (citing Miranda, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694). The North Carolina General Assembly has taken additional steps to protect a juvenile's right against self-incrimination in the North Carolina Juvenile Code, which provides that before custodial questioning, a juvenile must be advised:
(1) That [he] has the right to remain silent;

*141 (2) That any statement [he] does make can be and may be used against [him];
(3) That [he] has a right to have a parent, guardian, or custodian present during questioning; and
(4) That [he] has a right to consult with an attorney and that one will be appointed for [him] if [he] is not represented and wants representation.
N.C.G.S. § 7B-2101(a) (2007).
An individual is entitled to Miranda warnings and the protections of N.C.G.S. § 7B-2101 when it is apparent from the "totality of the circumstances" that there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." State v. Garcia, 358 N.C. 382, 399-400, 597 S.E.2d 724, 738 (2004) (citations and internal quotation marks omitted), cert. denied, 543 U.S. 1156, 125 S.Ct. 1301, 161 L.Ed.2d 122 (2005). The primary inquiry is "`whether a reasonable person in defendant's position, under the totality of the circumstances, would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest.'" State v. Barden, 356 N.C. 316, 337, 572 S.E.2d 108, 123 (2002) (emphasis added) (quoting Buchanan, 353 N.C. at 339-40, 543 S.E.2d at 828), cert. denied, 538 U.S. 1040, 123 S.Ct. 2087, 155 L.Ed.2d 1074 (2003).
Ultimately, the analysis in the instant case hinges upon whether defendant's age should be taken into consideration under the reasonable person standard when analyzing the circumstances surrounding the interrogation. The majority contends that Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004), should persuade this Court to not consider the age of the subject under the reasonable person standard. In Alvarado, the Supreme Court of the United States ruled that "[t]he Miranda custody inquiry is an objective test," id. at 667, 124 S.Ct. 2140, and because "consideration of a suspect's individual characteristicsincluding his agecould be viewed as creating a subjective inquiry," id. at 668, 124 S.Ct. 2140, age was irrelevant to a reasonable person's belief in a Miranda custody analysis. Id. Alvarado is not controlling in an analysis of N.C.G.S. § 7B-2101. See State v. Smith, 317 N.C. 100, 106, 343 S.E.2d 518, 521 (1986) ("In resolving [issues under N.C.G.S. § 7A-595]... cases decided under the fifth and sixth amendments to the United States Constitution are not controlling ....") overruled in part on other grounds by Buchanan, 353 N.C. at 340, 543 S.E.2d at 828. When analyzing N.C.G.S. § 7A-595, the predecessor provision of the Juvenile Code governing juvenile interrogations, this Court has found it appropriate to consider the subject's age under the reasonable person standard of the Miranda "in custody" analysis.[2] In State v. Smith this Court considered whether a sixteen year old was subjected to a custodial interrogation under N.C.G.S. § 7A-595. Id. at 102-08, 343 S.E.2d at 519-22. After considering the totality of the circumstances, including the length of the questioning and the constant presence of armed law enforcement officers, this Court determined that a person of "defendant's age and experience" would have believed he was in custody. Id. at 105, 343 S.E.2d at 520. Thus, the age of the defendant was a key consideration in determining whether a reasonable juvenile would have believed he was "in custody" under N.C.G.S. § 7A-595.
By failing to consider age, the majority's reasonable person standard is too rigid to apply to provisions of the Juvenile Code. It is logical that age should be considered as part of the reasonable person standard in a custody analysis under N.C.G.S. § 7B-2101. The many noble goals of the Juvenile Code include "protect[ing] the constitutional rights of juveniles" and their families and "provid[ing] uniform procedures that assure fairness and equity." N.C.G.S. § 7B-1500(4) (2007). The entire Code was created to ensure unique services for juveniles because of the special circumstances inherent in their youth; to ignore age when interpreting any section of the Juvenile Code defies common sense and the very purpose of the Code.
*142 Furthermore, a defendant's age is often considered throughout our jurisprudence and General Statutes. For example, under civil common law, there is a rebuttable presumption that juveniles between the ages of seven and fourteen are incapable of contributory negligence, and children under seven are "conclusively presumed to be incapable of contributory negligence." See Welch v. Jenkins, 271 N.C. 138, 142, 155 S.E.2d 763, 766 (1967) (citations omitted). In the criminal context, those under the age of six cannot be charged with a crime. See N.C.G.S. § 7B-1501(7) (2007). In North Carolina we have a separate juvenile court for youthful offenders; jurisdiction can be transferred to a superior court only if the juvenile is at least thirteen years old when the alleged felony was committed, if the juvenile has received proper notice and a hearing, and probable cause has been found. Id. § 7B-2200 (2007). Additionally, the Supreme Court of the United States has ruled that the Eighth Amendment forbids imposition of the death penalty on offenders under the age of eighteen when their crimes were committed. Roper v. Simmons, 543 U.S. 551, 578, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). The rationale behind these laws is practical and just. The perceptions, cognitive abilities, and moral development of juveniles are different from those of adults; thus, the law rightly takes this into account when dealing with juvenile offenders. The majority's failure to consider J.D.B's juvenile status in its reasonable person standard runs contrary to our established juvenile jurisprudence.
Furthermore, the arguments for excluding consideration of age under the reasonable person standard outlined in Alvarado are not present in the instant case. Alvarado's rationale for excluding age from a custody inquiry was to "give clear guidance to the police," 541 U.S. at 668, 124 S.Ct. 2140, so that law enforcement officers are not forced to "anticipat[e] the frailties or idiosyncra[s]ies of every person whom they question," id. at 667, 124 S.Ct. 2140 (quoting Berkemer v. McCarty, 468 U.S. 420, 442 n. 35, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (alterations in original) (internal quotation marks omitted)). Here, the difficulty of guessing defendant's age is nonexistent. Investigator DiCostanzo sought out J.D.B. at a middle school, where he knew J.D.B. was a seventh-grade student. All seventh graders are juveniles, roughly between the ages of twelve and fourteen, and as Investigator DiCostanzo testified, he was able to obtain J.D.B.'s exact age from school records. Therefore, defendant's "frailty"his youth was evident from the very location Investigator DiCostanzo selected to conduct the interrogation. Additionally, Investigator DiCostanzo was a juvenile investigator with the Chapel Hill Police Department, specially trained in dealing with juveniles and educated in laws concerning their rights. The Chapel Hill Police Department Policy Manual explicitly states:

Even if the juvenile is not in custody, it is good practice to have him sign a Miranda Rights waiver form before issuing a statement. If the juvenile does not sign a waiver, the officer must document that the juvenile is told that he is not under arrest and free to leave at any time, and that he agreed to talk.
Chapel Hill Police Dep't, Policy Manual No. 2-12 (Juvenile Response), at 4 (Dec. 15, 2006 (revised)) (emphasis added). In order to protect J.D.B.'s rights and fulfill the purpose of the Juvenile Code, Investigator DiCostanzo should have read J.D.B. his rights under N.C.G.S. § 7B-2101 before soliciting any statement, just as the Chapel Hill Police Department Policy Manual advises.
Because consideration of a subject's youth is particularly pertinent in analyzing any provision of the Juvenile Code, especially when doing so creates no undue burden on law enforcement officers, the proper inquiry in the instant case when determining whether defendant was in custody for the purposes of N.C.G.S. § 7B-2101 should be whether, under the totality of the circumstances, a reasonable juvenile in defendant's position would have believed he was under formal arrest or was restrained in his movement to the degree associated with a formal arrest. The majority concludes that there were not sufficient "indicia of formal arrest" to conclude that J.D.B. was in custody because the findings of fact do not indicate that J.D.B. was physically restrained or that the conference *143 room door was guarded or locked. While it is true that handcuffs were never applied to J.D.B. and the closed door of the room where he was detained was not locked, this does not mean he was not restrained. The majority's analysis ignores the Court's obligation to consider the totality of the circumstances and "the unique facts surrounding each incriminating statement." Garcia, 358 N.C. at 399, 597 S.E.2d at 738 (citations omitted). An examination of the totality of the circumstances leads to the conclusion that a reasonable juvenile in J.D.B.'s position would have believed he was restrained in his movement to the degree associated with a formal arrest.
First, the location of the interrogation must be considered. In any planned interrogation, law enforcement carefully chooses the location before questioning begins. The gold standard in enhanced interrogation preparation and training, utilized by both the Central Intelligence Agency and the Federal Bureau of Investigation, is the Army Field Manual on Human Intelligence Collector Operations. The Manual states:
When conducting ... operations, the location of the questioning will have psychological effects on the source. The questioning location should be chosen and set up to correspond to the effect that the [officer] wants to project and his planned approach techniques. For example, meeting in a social type situation such as a restaurant may place the source at ease. Meeting in an apartment projects informality while meeting in an office projects more formality. Meeting at the source's home normally places him at a psychological advantage, while meeting in the [officer's] work area gives the [officer] a psychological edge.
U.S. Dep't of the Army, Field Manual 2-22.3, Human Intelligence Collector Operations para. 7-12 (Sept. 6, 2006). As a trained investigator would know, the location of the interrogation in the instant case certainly would have a psychological effect on a reasonable person in J.D.B.'s position. A middle school is a restrictive environment. Unlike a university campus, where people may freely come and go, middle school students are not free to leave the campus without permission, and visitors to the school, including parents and guardians of students, must upon arrival report their presence and receive permission to be at the facility. Moreover, students at middle schools are instructed to obey the requests and directives of adults. The Student Handbook at Smith Middle School, where J.D.B. attended, instructs students to "[f]ollow directions of all teachers/adults the first time they are given," "[s]top moving when an adult addresses" them, and "[w]alk away only after the adult has dismissed" them.
Law enforcement in the instant case took advantage of the middle school's restrictive environment and its psychological effect by choosing to interrogate J.D.B. there, instead of at his home or in any other public, more neutral location. Certainly, if the larceny J.D.B. was suspected of committing had occurred on school grounds, law enforcement might understandably investigate suspects there, at the scene of the crime. However, the larceny in question occurred in a residential subdivision, not on the school campus. Law enforcement investigators could have first attempted to question J.D.B. at his residence. Instead, the school was selected as the interrogation site, a location where any reasonable juvenile in J.D.B.'s position would not only be at a psychological disadvantage, but where he would be defenseless, without the protection of a parent or guardian. It is troubling that in the instant case a public middle school, which should be an environment where children feel safe and protected, became a place where a law enforcement investigator claimed a tactical advantage over a juvenile.
Not only was J.D.B., or any reasonable juvenile in his position, at a disadvantage because of the location of the interrogation, but also by the manner in which it was conducted. J.D.B. was sitting in a classroom with his peers when the class was suddenly interrupted by Officer Gurley, Smith Middle School's resource officer. Officer Gurley removed J.D.B. from the classroom and escorted him to a school conference room. J.D.B. could have been asked by his teacher or any other school official to report to the conference room; instead, he was escorted by a uniformed, armed police officer. The only *144 logical reason for Officer Gurley to escort J.D.B. was to restrain his freedom of movement; J.D.B. had no choice but to comply with his removal from the classroom and Officer Gurley's instructions to walk to the conference room. If J.D.B. had refused to accompany Officer Gurley he likely would have faced disciplinary action from the school.[3] Therefore, J.D.B.'s freedom of movement was restricted from the moment he was removed from his classroom by Officer Gurley.
When J.D.B. arrived at the conference room, he was met by three other authoritative adults: Mr. Lyons, the school assistant principal; Mr. Benson, an intern with the school; and Investigator DiCostanzo of the Chapel Hill Police Department. J.D.B. was directed to take a seat at a conference table and the door to the office was closed. Investigator DiCostanzo was not in uniform, but dressed in a suit jacket and tie, and he introduced himself to J.D.B. as a juvenile investigator. That a special investigator from the police department, dressed in business attire, was making a special trip to the school would alert any reasonable middle school student that something serious was taking place, something more than a casual conversation about joining the Police Athletic League or participating in the Youth Partnership for Crime Prevention.
With these facts alone, there is enough evidence to conclude that a reasonable juvenile in J.D.B.'s position would have believed he was restrained in his movement to the degree associated with a formal arrest. The majority states that "[f]or a student in the school setting to be deemed in custody, law enforcement must subject the student to `restraint on freedom of movement' that goes well beyond the limitations that are characteristic of the school environment in general." If removal from a middle school classroom and being physically escorted by a uniformed, armed police officer to a closed conference room inhabited by four authoritative adults does not qualify as procedures that go well beyond the "typical restrictions" of a "school environment in general," it is hard to imagine any set of circumstances that the majority would label as a sufficient restraint on movement.
At this point in the interrogation, as noted above, the Chapel Hill Police Department Policy Manual instructs that before any questioning began, Investigator DiCostanzo should have informed J.D.B. of his rights under N.C.G.S. § 7B-2101. Had Investigator DiCostanzo simply followed the Manual, this case likely would not be before us. Instead, Investigator DiCostanzo immediately began the interrogation. J.D.B. was never told he was free to leave or that he was entitled to have a parent, guardian, or attorney present. When Investigator DiCostanzo began questioning J.D.B. about the larceny, J.D.B. denied any involvement. Yet, Assistant Principal Lyons urged J.D.B. to "do the right thing" and tell the truth. Investigator DiCostanzo continued to pressure J.D.B. to talk by confronting him with information that a stolen camera had been found. Still, at this point no one had advised J.D.B. of his rights. When J.D.B. inquired of Investigator DiCostanzo what would happen if the stolen items were returned, Investigator DiCostanzo replied that it would be helpful, but the matter would still have to go to court. Next, Investigator DiCostanzo informed J.D.B. that he might be forced to obtain a secure custody order for J.D.B. unless it was apparent that J.D.B. was not going to steal again. Investigator DiCostanzo explained to J.D.B. that a secure custody order would give law enforcement the right to hold J.D.B. in juvenile detention.[4] To a reasonable person in *145 J.D.B.'s position, this remark certainly qualifies as an indicium of formal arrest. Moreover, Investigator DiCostanzo's statement was nothing short of a veiled threat that J.D.B. would be physically detained unless he confessed. At this point, J.D.B. had already denied any involvement in the larceny, yet he was not permitted to leave; rather, he was encouraged to "do the right thing" and threatened with juvenile detention. A reasonable middle school student in J.D.B.'s position, after being physically escorted by a uniformed, armed officer to a closed conference room with four authoritative adults, would have considered himself to be physically restrained to the point of formal arrest. Moreover, under school policy, J.D.B. was not free to leave until he was dismissed by an adult. Furthermore, Investigator DiCostanzo, a special juvenile investigator with the Chapel Hill Police Department, threatened to hold J.D.B. in juvenile detention unless he divulged all his knowledge of the larceny. The totality of these circumstances leads to no other conclusion than that J.D.B. was "in custody."
Not surprisingly, after Investigator DiCostanzo's threat of a secure custody order, J.D.B. made incriminating statements linking him to the larceny. When J.D.B. made these statements he had not been advised of his rights. Investigator DiCostanzo's subsequent statements informing J.D.B. that he did not have to answer any questions and that he was free to leave are therefore irrelevant to this analysis. What these statements in fact do is exhibit crafty and highly questionable investigative tactics. Investigator DiCostanzo's warning was too little, too late, after J.D.B.'s constitutional rights had been circumvented.
The Standards Manual of the Law Enforcement Agency Accreditation Program states: "When dealing with juveniles, law enforcement officers should always make use of the least coercive among reasonable alternatives, consistent with preserving public safety, order, and individual liberty." Comm'n on Accreditation for Law Enforcement Agencies, Inc., Standards for Law Enforcement Agencies ch. 44 (Juvenile Operations), at 44-1 (4th ed. Jan. 1999). The actions of law enforcement in the instant case are inconsistent with these standards and evince a disregard for the protection of juvenile rights. It is disheartening and alarming that today's majority opinion condones the highly coercive actions of law enforcement in the instant case, which will only encourage law enforcement to disregard the provisions and procedures of N.C.G.S. § 7B-2101 in the future. Even radical Muslims suspected of terrorism are afforded broader constitutional protections than the majority wishes to give juveniles in J.D.B.'s position. Cf. Boumediene v. Bush, ___ U.S. ___, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (holding that alien enemy combatants detained at the U.S. Naval Station in Guantanamo Bay, Cuba, are entitled to certain constitutional privileges). The overriding goal of North Carolina's Juvenile Code is to protect the constitutional rights and best interests of juveniles and their families. Today's majority opinion is inconsistent with this goal. I would hold that because a reasonable person in J.D.B.'s position was in custody for the purposes of N.C.G.S. § 7B-2101, our state laws entitled J.D.B. to be informed of his rights before the *146 interrogation began. Accordingly, I respectfully dissent.
Justice HUDSON dissenting.
Because I believe the trial court's conclusions of law reflect an incorrect application of the law to the facts found, I respectfully dissent. "The determination of whether an interrogation is conducted while a person is in custody involves reaching a conclusion of law. While this conclusion may rest upon factual findings, it is a legal conclusion, fully reviewable, and not a finding of fact." State v. Greene, 332 N.C. 565, 577, 422 S.E.2d 730, 737 (1992) (citation omitted).
Accordingly, ... we review the trial court's conclusions of law for legal accuracy and to ensure that those conclusions reflect[] a correct application of [law] to the facts found. In doing so, this Court must look first to the circumstances surrounding the interrogation and second to the effect those circumstances would have on a reasonable person.
State v. Garcia, 358 N.C. 382, 391, 597 S.E.2d 724, 733 (2004) (second and third alterations in original) (citations and internal quotation marks omitted), cert. denied, 543 U.S. 1156, 125 S.Ct. 1301, 161 L.Ed.2d 122 (2005).
"In Miranda, the Supreme Court defined `custodial interrogation' as `questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" State v. Buchanan, 353 N.C. 332, 337, 543 S.E.2d 823, 826 (2001) (quoting Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966)). "[I]n determining whether a suspect [is] in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." State v. Gaines, 345 N.C. 647, 662, 483 S.E.2d 396, 405 (citation omitted), cert. denied, 522 U.S. 900, 118 S.Ct. 248, 139 L.Ed.2d 177 (1997). "The test for determining whether a person is in custody is an objective test as to whether a reasonable person in the position of the defendant would believe himself to be in custody or that he had been deprived of his freedom of action in some significant way." Greene, 332 N.C. at 577, 422 S.E.2d at 737 (citations omitted).
Here, the trial court determined that J.D.B. was not subjected to custodial interrogation when he was questioned at Smith Middle School. In doing so, the trial court made the following pertinent conclusions of law, which were challenged on appeal:
1. [J.D.B.] was not in custody when he was brought to the conference room to speak to ... [I]nvestigator [DiCostanzo].
2. The mere presence of ... [I]nvestigator [DiCostanzo] and the school resource officer did not convert the meeting into a custodial interrogation.
3. [J.D.B.] was informed that he was free to leave and that he did not have to answer any questions, but chose to stay and volunteer more information.
In my view, the trial court's uncontested and binding findings of fact pertaining to the circumstances surrounding the interrogation lead to the conclusion that "a reasonable person in the position of the defendant would [have] believe[d] himself to be in custody or that he had been deprived of his freedom of action in some significant way." Id. As such, I would hold that: (1) J.D.B. was subjected to custodial interrogation at Smith Middle School; (2) J.D.B. should have been Mirandized and provided the enhanced protections for juveniles contained in N.C.G.S. § 7B-2101; and (3) as a result, the trial court erred in denying his motion to suppress. Therefore, I respectfully dissent.
According to the majority, because the school environment "inherently deprives students of some freedom of action," for a juvenile "to be deemed in custody," the restraint that law enforcement imposes on the juvenile's freedom of action or movement while questioning the juvenile at school must go "well beyond the limitations that are characteristic of the school environment in general." I disagree with this reasoning, primarily because of its potential to seriously undermine the enhanced protections afforded to juveniles by the North Carolina General Assembly, *147 for example, as in N.C.G.S. § 7B-2101. See In re T.E.F., 359 N.C. 570, 575, 614 S.E.2d 296, 299 (2005) ("Our courts have consistently recognized that `[t]he [S]tate has a greater duty to protect the rights of a respondent in a juvenile proceeding than in a criminal prosecution.'" (alterations in original) (citations omitted)); In re Vinson, 298 N.C. 640, 652, 260 S.E.2d 591, 599 (1979) (stating this Court's intent "to carefully balance the State's police power interest in preserving order and its parens patriae interest in a delinquent child's welfare with the child's constitutional right to due process"). I fear that the majority here actually affords juveniles less protection when questioned by law enforcement officers at school, as compared to elsewhere. In my opinion, in the school environment, where juveniles are faced with a variety of negative consequencesincluding potential criminal chargesfor refusing to comply with the requests or commands of authority figures, the circumstances are inherently more coercive and require more, not less, careful protection of the rights of the juvenile.
The decision to interview a student at school could be made to take advantage of the student's minority [age]. Questioning the student at school, the officer not only takes advantage of the student's compulsory presence at school and the background norm of submission to authority, but also chooses to interact with the student at a time when the student will not be in the presence of a parent, the figure most likely to have the inclination or ability to either arrange for the presence of counsel or to advise the youth to refuse to answer the officer's questions.
Paul Holland, Schooling Miranda: Policing Interrogation in the Twenty-First Century Schoolhouse, 52 Loy. L.Rev. 39, 85 n. 175 (2006) [hereinafter Holland, Schooling Miranda]. I am particularly concerned about creating an incentive for an investigating police officer to enter a middle school to question a juvenile about crimes that may have occurred away from school grounds and to take advantage of the more restrictive school atmosphere without providing the protections of N.C.G.S. § 7B-2101. I am also concerned about the potential disruption of the learning atmosphere in the school, especially, but not exclusively, for the affected juvenile if this practice became widespread.
Even under the majority's analysis, though, I believe the record here establishes that the restraint on J.D.B.'s freedom of action or movement went "well beyond the limitations that are characteristic of the school environment in general" and thus, subjected J.D.B. to "custodial interrogation." The school resource officer, who was a uniformed police officer, came to thirteen-year-old J.D.B.'s classroom, removed him from class, and "escorted" him to a conference room where two school officials and Investigator DiCostanzo were waiting for him. No effort was made to contact J.D.B.'s parent or guardian before his removal from class or his questioning. For the entire interrogation, which lasted thirty to forty-five minutes, J.D.B. was isolated in a closed-door conference room in the presence of four authority figures, including two law enforcement officers. Contrary to the trial court's conclusion of law, Investigator DiCostanzo, an outside police officer, was not merely present. Rather, it appears that he directed and controlled the interrogation process, which was designed to determine J.D.B.'s role in nonviolent crimes alleged to have occurred outside of school grounds and for which he was a suspect. Despite J.D.B.'s repeated denials of any involvement in the criminal activity, Investigator DiCostanzo continued to question him. At some point during Investigator DiCostanzo's questioning, Assistant Principal David Lyons encouraged J.D.B. to "`do the right thing' and tell the truth." Thereafter, Officer DiCostanzo continued to question J.D.B., confronted him with the stolen camera, and indicated that others had seen the camera in J.D.B's possession. Then, J.D.B. made his first incriminating statement, asking if "he would still be in trouble if he gave the items back," also indicating that J.D.B. believed he was currently "in trouble." Investigator DiCostanzo responded that either way "the matter was still going to court" and that he might "have to seek a secure custody order," explaining to J.D.B. that such an order confines a juvenile to a detention center until his court date. After this sequence *148 of events, J.D.B. confessed. I would conclude that considering all of the above circumstances, "a reasonable person in [J.D.B.'s] position ... would [have] believe[d] himself to be in custody or that he had been deprived of his freedom of action in some significant way" by the time Investigator DiCostanzo confronted J.D.B. with the stolen camera. Greene, 332 N.C. at 577, 422 S.E.2d at 737.
In reaching the opposite conclusion, the majority emphasizes that: (1) Investigator DiCostanzo told J.D.B. that he was free to leave, asked him if he understood that he was not under arrest and did not have to speak to him, and that J.D.B. nodded his head indicating he understood; and (2) J.D.B. was not subjected to severe or direct physical restraint, such as an officer standing guard at the door. However, Investigator DiCostanzo did not inform J.D.B. that he was free to leave and not under arrest until after J.D.B. had incriminated himself in response to the interrogation, without having been informed of his Miranda and juvenile statutory rights. I would conclude that this process violated both Miranda and N.C.G.S. § 7B-2101(a) and (b) and that the motion to suppress should have been allowed. See N.C.G.S. § 7B-2101 (2007); Missouri v. Seibert, 542 U.S. 600, 604, 124 S.Ct. 2601, 159 L.Ed.2d 643, 650 (2004) (plurality) (stating that "midstream recitation of [Miranda] warnings after interrogation and unwarned confession" does "not effectively comply with Miranda's constitutional requirement"); see also N.C.G.S. § 7B-2101(a)(3) (stating that a juvenile who is in custody "must [also] be advised prior to questioning" of his "right to have a parent, guardian, or custodian present during questioning"); id. § 7B-2101(b) (stating that for juveniles, such as J.D.B., who are "less than 14 years of age, no in-custody admission or confession resulting from interrogation may be admitted into evidence unless the confession or admission was made in the presence of the juvenile's parent, guardian, custodian, or attorney").
With regard to stronger indicia of physical control, such as handcuffs or an officer standing guard at the door, this Court has never held that one or more of these indicia must be present to support a determination that an individual is in custody. In fact, in Buchanan this Court stated: "Circumstances supporting an objective showing that one is `in custody' might [, not must,] include a police officer standing guard at the door, locked doors or application of handcuffs." 353 N.C. at 339, 543 S.E.2d at 828 (emphasis added). Thus, the absence of such forms of restraint, while a relevant consideration in this inquiry, is not dispositive. Furthermore, "[United States Supreme Court] cases establish that, even if the police do not tell a suspect he is under arrest, do not handcuff him, do not lock him in a cell, and do not threaten him, he may nonetheless ... be in custody for Miranda purposes." Yarborough v. Alvarado, 541 U.S. 652, 675, 124 S.Ct. 2140, 2156, 158 L.Ed.2d 938, 958-59 (2004) (Breyer, Stevens, Souter & Ginsburg, JJ., dissenting) (citing Stansbury v. California, 511 U.S. 318, 325-26, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293, 300-01 (1994) (per curiam); Berkemer v. McCarty, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 335 (1984)). Here, law enforcement questioned a thirteen-year-old seventh-grader about nonviolent offenses while he was at school, in a closed room, and in the presence of four authority figures, all adults. Taken with the sequence of events in the interrogation itself, I conclude that J.D.B. was subjected to a custodial interrogation.
As support for its determination that J.D.B. was not subjected to custodial interrogation, the majority cites our recent opinion in In re W.R., 363 N.C. 244, 675 S.E.2d 342 (2009). However, that case is both procedurally and factually distinguishable from this one and is of limited to no precedential value in resolving the custody issue here.
In In re W.R., unlike here, the juvenile failed to make a motion to suppress or to object when his incriminatory statements were offered into evidence, and the juvenile did not assert at the trial level that his incriminatory statements were obtained in violation of either the Fifth Amendment or N.C.G.S. § 7B-2101. Id. at 247, 675 S.E.2d at 344. As a result, this Court's review was for plain error. Id. In addition, because "no evidence was presented and no findings were *149 made as to ... the school resource officer's actual participation in the questioning of W.R.[,] ... the custodial or noncustodial nature of the interrogation[,] .... [or] whether the statements were freely and voluntarily made," this Court stated:
After careful review, we are not prepared based on the limited record before this Court to conclude that the presence and participation of the school resource officer at the request of school administrators conducting the investigation rendered the questioning of respondent juvenile a "custodial interrogation," requiring Miranda warnings and the protections of N.C.G.S. § 7B-2101.
363 N.C. at 248, 675 S.E.2d at 344. In other words, the record pertaining to law enforcement's role in W.R.'s interrogation was insufficient for this Court to make a determination that the interrogation was custodial.
Also numerous important facts bearing on the custody issue distinguish In re W.R. from this case. There, unlike here: (1) the assistant principal and the principal, not a law enforcement officer, took the juvenile out of class and "escorted" him to the principal's office after a concerned parent called the school and stated that the juvenile had possessed a knife at school and on the school bus the previous day; (2) both school administrators questioned the juvenile about the alleged "in school" incident and not about crimes alleged to have occurred outside of school grounds; (3) the school resource officer apparently was not present at the start of questioning and left the room at various points; (4) no outside police officer participated; and (5) school administrators, not law enforcement, controlled the questioning. Id. at 246, 675 S.E.2d at 343.
In further contrast to the majority, I believe J.D.B.'s age, thirteen, (and his status as a middle school student) are relevant considerations in determining "whether a reasonable person in the position of the defendant would [have] believe[d] himself to be in custody or that he had been deprived of his freedom of action in some significant way." Greene, 332 N.C. at 577, 422 S.E.2d at 737.[5] In support of its conclusion that a juvenile's age should not be considered as part of the custody analysis, the majority: (1) states that this Court has not previously considered an individual's age in conducting the custody inquiry, citing In re W.R. in support; and (2) relies on language from Yarborough v. Alvarado, which states that an "argument [exists] that the custody inquiry states an objective rule designed to give clear guidance to the police, while consideration of a suspect's individual characteristicsincluding his age could be viewed as creating a subjective inquiry." 541 U.S. at 668, 124 S.Ct. at 2151, 158 L.Ed.2d at 954 (majority) (citation omitted). I do not find this reasoning persuasive here.[6] The dissent in the Court of Appeals correctly noted that not considering age "would lead to the absurd result that, when required to determine whether a `reasonable person in the defendant's situation' would *150 consider himself in custody, courts would apply exactly the same analysis, regardless of whether the individual was eight or thirty-eight years old." In re J.D.B., ___ N.C.App. at ___, 674 S.E.2d. at 802 (2009) (Beasley, J. dissenting) (citation omitted).
Neither this Court nor the United States Supreme Court has held squarely that age can never be relevant to the custody inquiry. Nor did we conduct a custody analysis in In re W.R. without considering the juvenile's age. Rather, as noted above, this Court simply determined that the record on appeal regarding the role of law enforcement in questioning the juvenile was insufficient on the custody issue. The majority concedes that Alvarado is not binding authority on this Court. Furthermore, while the Supreme Court there held that the state court's failure to consider the defendant's age (seventeen) was reasonable in considering custody under Miranda, I conclude that the matter is very different when the interrogation is conducted in school. As Justice O'Connor stated in her concurring opinion in Alvarado, "There may be cases in which a suspect's age will be relevant to the `custody' inquiry under Miranda." 541 U.S. at 669, 124 S.Ct. at 2152, 158 L.Ed.2d at 954-55 (O'Connor, J., concurring) (citation omitted). I share the view expressed by Justice Breyer in his dissenting opinion, that a juvenile's youth "is not a special quality, but rather a widely shared characteristic that generates commonsense conclusions about behavior and perception." Id. at 674, 124 S.Ct. at 2155, 158 L.Ed.2d at 958 (Breyer, J., dissenting).
It is clear from the enhanced protections given to juveniles that our General Assembly considers age very important under state law, especially when the juvenile is under fourteen, like J.D.B. "To focus on the circumstance of age in a case like this does not complicate the `in custody' inquiry." Id. at 674-75, 124 S.Ct. at 2155, 158 L.Ed.2d at 958 (citation omitted).
Outside officers conducting interviews at schools are likely doing so only when they are looking for a specific student and thus are likely to already know the student's age. Even if they do not, these officers rely on school staff to assist them in establishing contact with the student. These staff members, of course, have access to the student's records, which will include the age. Seen in this context, courts considering the age of the suspect are not imposing an extra burden of intuition or information on officers but are instead seeing the interrogation in its full context, as it is likely seen by those involved.
Holland, Schooling Miranda 85 (footnote omitted). Here, Investigator DiCostanzo specifically testified that he had been informed by school administrators that J.D.B. was thirteen years old before questioning him.
In sum, I would hold that, under all these circumstances, including his age, J.D.B. was in custody while being questioned at Smith Middle School; consequently, his constitutional and juvenile statutory rights were violated due to law enforcement's failure to Mirandize him or to comply with N.C.G.S. § 7B-2101 and the trial court erred in denying his motion to suppress. Therefore, I respectfully dissent.
Justice TIMMONS-GOODSON joins in this dissenting opinion.
NOTES
[1] We are aware that Alvarado is not binding on this Court because the Supreme Court of the United States merely held in that case that "[t]he state court considered the proper factors and reached a reasonable conclusion" and, thus, that an application for a writ of habeas corpus under 28 U.S.C. § 2254(d)(1) should not have been granted. 541 U.S. at 669, 124 S.Ct. at 2152, 158 L.Ed.2d at 954. We nonetheless consider Alvarado persuasive.
[2] N.C.G.S. § 7A-595 formerly governed juvenile interrogations and its provisions are nearly identical to the current N.C.G.S. § 7B-2101. See N.C.G.S. § 7A-595 (1986).
[3] Additionally, amici argue that refusal to follow an order given by a school official can ultimately lead to criminal charges under N.C.G.S. § 14-288.4, which provides that a person who willfully engages in disorderly conduct by "[d]isrupt[ing], disturb[ing] or interfer[ing] with the teaching of students ... or disturb[ing] the peace, order or discipline at any ... educational institution" is "guilty of a Class 2 misdemeanor." N.C.G.S. § 14-288.4(a)(6) (2007). Under N.C.G.S. § 115C-378 (2007) parents can also be prosecuted for violating the Compulsory Attendance Law if their children fail to attend school.
[4] A juvenile held under a secure custody order is entitled to far fewer protections than an adult taken into custody. Once an adult defendant is taken into police custody he is required to be brought before a magistrate for a hearing "without unnecessary delay" pursuant to N.C.G.S. § 15A-501 (2007). At this appearance, the magistrate must release the defendant in accordance with Article 26 of Chapter 15A, or commit the defendant to a detention facility pursuant to N.C.G.S. § 15A-521, pending further proceedings in the case. Id. § 15A-511(e) (2007). After appearing before a magistrate, an adult criminal defendant must be brought before a district court judge for an initial appearance within 96 hours of being taken into custody to determine the sufficiency of the charges against the defendant and to inform the defendant of his rights, including the right against self-incrimination and the right to counsel. Id. §§ 15A-601 to 604 (2007). The district court judge is also required to review the defendant's eligibility for release pursuant to Article 26 Chapter 15A, and to schedule a probable cause hearing for the defendant, unless the right to such hearing is waived. Id. §§ 15A-605 to 606 (2007). Further, if a grand jury returns a bill of indictment "as not a true bill, the presiding judge must immediately examine the case records to determine if the defendant is in custody or subject to bail or conditions of pretrial release." Id. § 15A-629 (2007). Unlike these procedures afforded to adult defendants, which ensure hearings for pretrial release are held immediately, juveniles who are held under secure custody orders can be detained for up to five calendar days before receiving a hearing on the merits to determine the need for continued custody. See id. § 7B-1906 (2007).
[5] J.D.B. also argues, and the dissent in the Court of Appeals appears to suggest, that J.D.B.'s enrollment in "special education classes" is a relevant factor to consider in conducting the custody analysis. See In re J.D.B., ___ N.C.App. ___, ___, 674 S.E.2d 795, 802 (2009) (Beasley, J., dissenting). Because the record is silent as to the nature and extent of J.D.B.'s academic status and whether Investigator DiCostanzo knew or reasonably could have known about it, I have not considered J.D.B.'s status as a special education student.
[6] In In re R.H., a panel of the Court of Appeals determined that the trial court did not err in denying the juvenile's motion to suppress his confession because the juvenile was not in custody. In re R.H., 171 N.C.App. 514, 615 S.E.2d 738, 2005 WL 1669032, 2005 N.C.App. LEXIS 1309 (2005) (unpublished). There, the juvenile was questioned by an outside law enforcement officer at school regarding a purported crime away from school grounds. 2005 WL 1669032, at *1, 2005 N.C.App. LEXIS 1309, at *2. Even though that case was unpublished, the differences between how the officer approached his questioning of the juvenile there and here are striking. There, before questioning the juvenile, the officer obtained permission from the fourteen-year-old's mother to talk to him at school and explained to him that "he was not under arrest," that he "could leave and return to class at any time and that regardless of what [the] juvenile told him that day, he would not arrest [him]." Id., 2005 WL 1669032, at *2, 2005 N.C.App. LEXIS 1309, at *4. By contrast with what happened here, I believe the approach taken by the officer in that case can be squared with Miranda and the enhanced statutory protections for juveniles.