Justice Sotomayor
delivered the opinion of the Court.
This case presents the question whether the age of a child subjected to police questioning is relevant to the custody-analysis of Miranda v. Arizona, 384 U. S. 436 (1966). It is beyond dispute that children will often feel bound to submit to police questioning when an adult in the same cireum- *265 stances would feel free to leave. Seeing no reason for police officers or courts to blind themselves to that commonsense reality, we hold that a child’s age properly informs the Miranda custody analysis.
I
A
Petitioner J. D. B. was a 13-year-old, seventh-grade student attending class at Smith Middle School in Chapel Hill, North Carolina, when he was removed from his classroom by a uniformed police officer, escorted to a closed-door conference room, and questioned by police for at least half an hour.
This was the second time that police questioned J. D. B. in the span of a week. Five days earlier, two home break-ins occurred, and various items were stolen. Police stopped and questioned J. D. B. after he was seen behind a residence in the neighborhood where the crimes occurred. That same day, police also spoke to J. D. B.’s grandmother — his legal guardian — as well as his aunt.
Police later learned that a digital camera matching the description of one of the stolen items had been found at J. D. B.’s middle school and seen in J. D. B.’s possession. Investigator DiCostanzo, the juvenile investigator with the local police force who had been assigned to the case, went to the school to question J. D. B. Upon arrival, DiCostanzo informed the uniformed police officer on detail to the school (a so-called school resource officer), the assistant principal, and an administrative intern that he was there to question J. D. B. about the break-ins. Although DiCostanzo asked the school administrators to verify J. D. B.’s date of birth, address, and parent contact information from school records, neither the police officers nor the school administrators contacted J. D. B.’s grandmother.
The uniformed officer interrupted J. D. B.’s afternoon social studies class, removed J. D. B. from the classroom, and *266 escorted him to a school conference room.[1] There, J. D. B. was met by DiCostanzo, the assistant principal, and the administrative intern. The door to the conference room was closed. With the two police officers and the two administrators present, J. D. B. was questioned for the next 30 to 45 minutes. Prior to the commencement of questioning, J. D. B. was given neither Miranda warnings nor the opportunity to speak to his grandmother. Nor was he informed that he was free to leave the room.
Questioning began with small talk — discussion of sports and J. D. B.’s family life. DiCostanzo asked, and J. D. B. agreed, to discuss the events of the prior weekend. Denying any wrongdoing, J. D. B. explained that he had been in the neighborhood where the crimes occurred because he was seeking work mowing lawns. DiCostanzo pressed J. D. B. for additional detail about his efforts to obtain work; asked J. D. B. to explain a prior incident, when one of the victims returned home to find J. D. B. behind her house; and confronted J. D. B. with the stolen camera. The assistant principal urged J. D. B. to “do the right thing,” warning J.' D. B. that “the truth always comes out in the end.” App. 99a, 112a.
Eventually, J. D. B. asked whether he would “still be in trouble” if he returned the “stuff.” Ibid. In response, DiCostanzo explained that return of the stolen items would be helpful, but “this thing is going to court” regardless. Id., at 112a; ibid. (“[WJhat’s done is done[;] now you need to help yourself by making it right”); see also id., at 99a. DiCos-tanzo then warned that he may need to seek a secure custody order if he believed that J. D. B. would continue to break into other homes. When J. D. B. asked what a secure custody *267 order was, DiCostanzo explained that “it’s where you get sent to juvenile detention before court.” Id,, at 112a.
After learning of the prospect of juvenile detention, J. D. B. confessed that he and a friend were responsible for the break-ins. DiCostanzo only then informed J. D. B. that he could refuse to answer the investigator’s questions and that he was free to leave.[2] Asked whether he understood, J. D. B. nodded and provided further detail, including information about the location of the stolen items. Eventually J. D. B. wrote a statement, at DiCostanzo’s request. When the bell rang indicating the end of the schoolday, J. D. B. was allowed to leave to catch the bus home.
B
Two juvenile petitions were filed against J. D. B., each alleging one count of breaking and entering and one count of larceny. J. D. B.’s public defender moved to suppress his statements and the evidence derived therefrom, arguing that suppression was necessary because J. D. B. had been “interrogated by police in a custodial setting without being afforded Miranda warning[s],” id., at 89a, and because his *268 statements were involuntary under the totality of the circumstances test, id., at 142a; see Schneckloth v. Bustamonte, 412 U. S. 218, 226 (1973) (due process precludes admission of a confession where “a defendant’s will was overborne” by the circumstances of the interrogation). After a suppression hearing at which DiCostanzo and J. D. B. testified, the trial court denied the motion, deciding that J. D. B. was not in custody at the time of the schoolhouse interrogation and that his statements were voluntary. As a result, J. D. B. entered a transcript of admission to all four counts, renewing his objection to the denial of his motion to suppress, and the court adjudicated J. D. B. delinquent.
A divided panel of the North Carolina Court of Appeals affirmed. In re J. D. B., 196 N. C. App. 234, 674 S. E. 2d 795 (2009). The North Carolina Supreme Court held, over two dissents, that J. D. B. was not in custody when he confessed, “declin[ing] to extend the test for custody to include consideration of the age ... of an individual subjected to questioning by police.” In re J. D. B., 363 N. C. 664, 672, 686 S. E. 2d 135, 140 (2009).[3]
We granted certiorari to determine whether the Miranda custody analysis includes consideration of a juvenile suspect’s age. 562 U. S. 1001 (2010).
I — t t-H
A
Any police interview of an individual suspected of a crime has “coercive aspects to it.” Oregon v. Mathiason, 429 U. S. 492, 495 (1977) (per curiam). Only those interrogations that occur while a suspect is in police custody, however, “heighte[n] the risk” that statements obtained are not the *269 product of the suspect’s free choice. Dickerson v. United States, 530 U. S. 428, 435 (2000).
By its very nature, custodial police interrogation entails “inherently compelling pressures.” Miranda, 384 U. S., at 467. Even for an adult, the physical and psychological isolation of custodial interrogation can “undermine the individual’s will to resist and ... compel him to speak where he would not otherwise do so freely.” Ibid. Indeed, the pressure of custodial interrogation is so immense that it “can induce a frighteningly high percentage of people to confess to crimes they never committed.” Corley v. United States, 556 U. S. 303, 321 (2009) (citing Drizin & Leo, The Problem of False Confessions in the Post-DNA World, 82 N. C. L. Rev. 891, 906-907 (2004)); see also Miranda, 384 U. S., at 455, n. 23. That risk is all the more troubling — and recent studies suggest, all the more acute — when the subject of custodial interrogation is a juvenile. See Brief for Center on Wrongful Convictions of Youth et al. as Amici Curiae 21-22 (collecting empirical studies that “illustrate the heightened risk of false confessions from youth”).
Recognizing that the inherently coercive nature of custodial interrogation “blurs the line between voluntary and involuntary statements,” Dickerson, 530 U. S., at 435, this Court in Miranda adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination. Prior to questioning, a suspect “must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.” 384 U. S., at 444; see also Florida v. Powell, 559 U. S. 50, 60 (2010) (“The four warnings Miranda requires are invariable, but this Court has not dictated the words in which the essential information must be conveyed”). And, if a suspect makes a statement during custodial interrogation, the burden is on the Government to show, as a “prerequisite]” to the statement’s admissibility as evi *270 dence in the Government’s case in chief, that the defendant “voluntarily, knowingly and intelligently” waived his rights.[4] Miranda, 384 U. S., at 444, 475-476; Dickerson, 530 U. S., at 443-444.
Because these measures protect the individual against the coercive nature of custodial interrogation, they are required “ ‘only where there has been such a restriction on a person’s freedom as to render him “in custody.”’” Stansbury v. California, 511 U. S. 318, 322 (1994) (per curiam) (quoting Mathiason, 429 U. S., at 495). As we have repeatedly emphasized, whether a suspect is “in custody” is an objective inquiry.
“Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players’ lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.” Thompson v. Keohane, 516 U. S. 99, 112 (1995) (internal quotation marks, alteration, and footnote omitted).
See also Yarborough v. Alvarado, 541 U. S. 652, 662-663 (2004); Stansbury, 511 U. S., at 323; Berkemer v. McCarty, 468 U. S. 420, 442, and n. 35 (1984). Rather than demarcate a limited set of relevant circumstances, we have required police officers and courts to “examine all of the circumstances *271 surrounding the interrogation,” Stansbury, 511 U. S., at 322, including any circumstance that “would have affected how a reasonable person” in the suspect’s position “would perceive his or her freedom to leave,” id., at 325. On the other hand, the “subjective views harbored by either the interrogating officers or the person being questioned” are irrelevant. Id., at 323. The test, in other words, involves no consideration of the “actual mindset” of the particular suspect subjected to police questioning. Alvarado, 541 U. S., at 667; see also California v. Beheler, 463 U. S. 1121, 1125, n. 3 (1983) (per curiam).
The benefit of the objective custody analysis is that it is “designed to give clear guidance to the police.” Alvarado, 541 U. S., at 668. But see Berkemer, 468 U. S., at 441 (recognizing the “occasiona[l]. . . difficulty” that police and courts nonetheless have in “deciding exactly when a suspect has been taken into custody”). Police must make in-the-moment judgments as to when to administer Miranda warnings. By limiting analysis to the objective circumstances of the interrogation, and asking how a reasonable person in the suspect’s position would understand his freedom to terminate questioning and leave, the objective test avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person’s subjective state of mind. See id., at 430-431 (officers are not required to “make guesses” as to circumstances “unknowable” to them at the time); Alvarado, 541 U. S., at 668 (officers are under no duty “to consider ... contingent psychological factors when deciding when suspects should be advised of their Miranda rights”).
B
The State and its amici contend that a child’s age has no place in the custody analysis, no matter how young the child subjected to police questioning. We cannot agree. In some circumstances, a child’s age “would have affected how a rea *272 sonable person” in the suspect’s position “would perceive his or her freedom to leave.” Stansbury, 511 U. S., at 325. That is, a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go. We think it clear that courts can account for that reality without doing any damage to the objective nature of the custody analysis.
A child’s age is far “more than a chronological fact.” Eddings v. Oklahoma, 455 U. S. 104, 115 (1982); accord, Gall v. United States, 552 U. S. 38, 58 (2007); Roper v. Simmons, 543 U. S. 551, 569 (2005); Johnson v. Texas, 509 U. S. 350, 367 (1993). It is a fact that “generates commonsense conclusions about behavior and perception.” Alvarado, 541 U. S., at 674 (Breyer, J., dissenting). Such conclusions apply broadly to children as a class. And, they are self-evident to anyone who was a child once himself, including any police officer or judge.
Time and again, this Court has drawn these commonsense conclusions for itself. We have observed that children “generally are less mature and responsible than adults,” Ed-dings, 455 U. S., at 115-116; that they “often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them,” Bellotti v. Baird, 443 U. S. 622, 635 (1979) (plurality opinion); that they “are more vulnerable or susceptible to ... outside pressures” than adults, Roper, 543 U. S., at 569; and so on. See Graham v. Florida, 560 U. S. 48, 68 (2010) (finding no reason to “reconsider” these observations about the common “nature of juveniles”). Addressing the specific context of police interrogation, we have observed that events that “would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens.” Haley v. Ohio, 332 U. S. 596, 599 (1948) (plurality opinion); see also Gallegos v. Colorado, 370 U. S. 49, 54 (1962) (“[N]o matter how sophisticated,” a juvenile subject of police interrogation “cannot be compared” to an *273 adult subject). Describing no one child in particular, these observations restate what “any parent knows” — indeed, what any person knows — about children generally. Roper, 543 U. S., at 569.[5]
Our various statements to this effect are far from unique. The law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them. See, e. g., 1 W. Blackstone, Commentaries on the Laws of England *464-*465 (hereinafter Blackstone) (explaining that limits on children’s legal capacity under the common law “secure them from hurting themselves by their own improvident acts”). Like this Court’s own generalizations, the legal disqualifications placed on children as a class — e. g., limitations on their ability to alienate property, enter a binding contract enforceable against them, and marry without parental consent — exhibit the settled understanding that the differentiating characteristics of youth are universal.[6]
*274 Indeed, even where a “reasonable person” standard otherwise applies, the common law has reflected the reality that children are not adults. In negligence suits, for instance, where liability turns on what an objectively reasonable person would do in the circumstances, “[a]ll American jurisdictions accept the idea that a person’s childhood is a relevant circumstance” to be considered. Restatement (Third) of Torts § 10, Comment b, p. 117 (2005); see also id., Reporters’ Note, pp. 121-122 (collecting cases); Restatement (Second) of Torts §283A, Comment b, p. 15 (1963-1964) (“[TJhere is a wide basis of community experience upon which it is possible, as a practical matter, to determine what is to be expected of [children]”).
As this discussion establishes, “[o]ur history is replete with laws and judicial recognition” that children cannot be viewed simply as miniature adults. Eddings, 455 U. S., at 115-116. We see no justification for taking a different course here. So long as the child’s age was known to the officer at the time of the interview, or would have been objectively apparent to any reasonable officer, including age as part of the custody analysis requires officers neither to consider circumstances “unknowable” to them, Berkemer, 468 U. S., at 430, nor to “anticipate] the frailties or idiosyncrasies” of the particular suspect whom they question, Alvarado, 541 U. S., at 662 (internal quotation marks omitted). The same “wide basis of community experience” that makes it possible, as an objective matter, “to determine what is to be expected” of children in other contexts, Restatement (Second) of Torts §283A, at 15; see supra, at 273, and n. 6, likewise makes it possible to know what to expect of children subjected to police questioning.
*275 In other words, a child’s age differs from other personal characteristics that, even when known to police, have no objectively discernible relationship to a reasonable person’s understanding of his freedom of action. Alvarado holds, for instance, that a suspect’s prior interrogation history with law enforcement has no role to play in the custody analysis because such experience could just as easily lead a reasonable person to feel free to walk away as to feel compelled to stay in place. 541 U. S., at 668. Because the effect in any given case would be “contingent [on the] psychologty]” of the individual suspect, the Court explained, such experience cannot be considered without compromising the objective nature of the custody analysis. Ibid. A child’s age, however, is different. Precisely because childhood yields objective conclusions like those we have drawn ourselves — among others, that children are “most susceptible to influence,” Eddings, 455 U. S., at 115, and “outside pressures,” Roper, 543 U. S., at 569 — considering age in the custody analysis in no way involves a determination of how youth “subjectively affect[s] the mindset” of any particular child, Brief for Respondent 14.[7]
In fact, in many cases involving juvenile suspects, the custody analysis would be nonsensical absent some consideration of the suspect’s age. This case is a prime example. Were the court precluded from taking J. D. B.’s youth into account, it would be forced to evaluate the circumstances present here through the eyes of a reasonable person of average years. In other words, how would a reasonable adult understand his situation, after being removed from a seventh-grade social studies class by a uniformed school re *276 source officer; being encouraged by his assistant principal to “do the right thing”; and being warned by a police investigator of the prospect of juvenile detention and separation from his guardian and primary caretaker? To describe such an inquiry is to demonstrate its absurdity. Neither officers nor courts can reasonably evaluate the effect of objective circumstances that, by their nature, are specific to children without accounting for the age of the child subjected to those circumstances.
Indeed, although the dissent suggests that concerns “regarding the application of the Miranda custody rule to minors can be accommodated by considering the unique circumstances present when minors are questioned in school,” post, at 297 (opinion of Auto, J.), the effect of the schoolhouse setting cannot be disentangled from the identity of the person questioned. A student — whose presence at school is compulsory and whose disobedience at school is cause for disciplinary action — is in a far different position than, say, a parent volunteer on school grounds to chaperone an event, or an adult from the community on school grounds to attend a basketball game. Without asking whether the person “questioned in school” is a “minor,” ibid., the coercive effect of the schoolhouse setting is unknowable.
Our prior decision in Alvarado in no way undermines these conclusions. In that case, we held that a state-court decision that failed to mention a 17-year-old’s age as part of the Miranda custody analysis was not objectively unreasonable under the deferential standard of review set forth by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214. Like the North Carolina Supreme Court here, see 363 N. C., at 672, 686 S. E. 2d, at 140, we observed that accounting for a juvenile’s age in the Miranda custody analysis “could be viewed as creating a subjective inquiry,” 541U. S., at 668. We said nothing, however, of whether such a view would be correct under the law. Cf. Renico v. Lett, 559 U. S. 766, 778, n. 3 (2010) (“[Wjhether *277 the [state court] was right or wrong is not the pertinent question under AEDPA”). To the contrary, Justice O’Con-nor’s concurring opinion explained that a suspect’s age may indeed “be relevant to the 'custody’ inquiry.” Alvarado, 541 U. S.; at 669. '
Reviewing the question de novo today, we hold that so long as the child’s age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test.[8] This is not to say that a child’s age will be a determinative, or even a significant, factor in every case. Cf. ibid. (O’Connor, J., concurring) (explaining that a state-court decision omitting any mention of the defendant’s age was not unreasonable under AEDPA’s deferential standard of review where the defendant “was almost 18 years old at the time of his interview”); post, at 296 (suggesting that “teenagers nearing the age of majority” are likely to react to an interrogation as would a “typical 18-year-old in similar circumstances”). It is, however, a reality that courts cannot simply ignore.
Ill
The State and its amici offer numerous reasons that courts must blind themselves to a juvenile defendant’s age. None is persuasive.
*278 To start, the State contends that a child’s age must be excluded from the custody inquiry because age is a personal characteristic specific to the suspect himself rather than an “external” circumstance of the interrogation. Brief for Respondent 21; see also id., at 18-19 (distinguishing “personal characteristics” from “objective facts related to the interrogation itself” such as the location and duration of the interrogation). Despite the supposed significance of this distinction, however, at oral argument counsel for the State suggested without hesitation that at least some undeniably personal characteristics — for instance, whether the individual being questioned is blind — are circumstances relevant to the custody analysis. See Tr. of Oral Arg. 41. Thus, the State's quarrel cannot be that age is a personal characteristic, without more.[9]
The State further argues that age is irrelevant to the custody analysis because it “go[esj to how a suspect may internalize and perceive the circumstances of an interrogation.” Brief for Respondent 12; see also Brief for United States as Amicus Curiae 21 (hereinafter U. S. Brief) (arguing that a child’s age has no place in the custody analysis because it goes to whether a suspect is “particularly susceptible” to the external circumstances of the interrogation (some internal quotation marks omitted)). But the same can be said of every objective circumstance that the State agrees is relevant to the custody analysis: Each circumstance goes to how a reasonable person would “internalize and perceive” every other. See, e. g., Stansbury, 511 U. S., at 325. Indeed, this is the very reason that we ask whether the objective circumstances “add up to custody,” Keohane, 516 U. S., at 113, instead of evaluating the circumstances one by one.
*279 In the same vein, the State and its amici protest that the “effect of . . . age on [the] perception of custody is internal,” Brief for Respondent 20, or “psychological,” U. S. Brief 21. But the whole point of the custody analysis is to determine whether, given the circumstances, “a reasonable person [would] have felt he or she was ... at liberty to terminate the interrogation and leave.” Keohane, 516 U. S., at 112. Because the Miranda custody inquiry turns on the mindset of a reasonable person in the suspect’s position, it cannot be the ease that a circumstance is subjective simply because it has an “internal” or “psychological” impact on perception. Were that so, there would be no objective circumstances to consider at all.
Relying on our statements that the objective custody test is “designed to give clear guidance to the police,” Alvarado, 541 U. S., at 668, the State next argues that a child’s age must be excluded from the analysis in order to preserve clarity. Similarly, the dissent insists that the clarity of the custody analysis will be destroyed unless a “one-size-fits-all reasonable-person test” applies. Post, at 293. In reality, however, ignoring a juvenile defendant’s age will often make the inquiry more artificial, see supra, at 275-276, and thus only add confusion. And in any event, a child’s age, when known or apparent, is hardly an obscure factor to assess. Though the State and the dissent worry about gradations among children of different ages, that concern cannot justify ignoring a child’s age altogether. Just as police officers are competent to account for other objective circumstances that are a matter of degree such as the length of questioning or the number of officers present, so too are they competent to evaluate the effect of relative age. Indeed, they are competent to do so even though an interrogation room lacks the “reflective atmosphere of a [jury] deliberation room,” post, at 295. The same is true of judges, including those whose childhoods have long since passed, see post, at 293. In short, officers and judges need no imaginative powers, knowledge of developmental psychology, training in cognitive science, or expertise *280 in social and cultural anthropology to account for a child’s age. They simply need the common sense to know that a 7-year-old is not a 13-year-old and neither is an adult.
There is, however, an even more fundamental flaw with the State’s plea for clarity and the dissent’s singular focus on simplifying the analysis: Not once have we excluded from the custody analysis a circumstance that we determined was relevant and objective, simply to make the fault line between custodial and noncustodial “brighter.” Indeed, were the guiding concern clarity and nothing else, the custody test would presumably ask only whether the suspect had been placed under formal arrest. Berkemer, 468 U. S., at 441; see ibid, (acknowledging the “occasional] . . . difficulty” police officers confront in determining when a suspect has been taken into custody). But we have rejected that “more easily administered line,” recognizing that it would simply “enable the police to circumvent the constraints on custodial interrogations established by Miranda.” Ibid.; see also ibid., n. 33.[10]
Finally, the State and the dissent suggest that excluding age from the custody analysis comes at no cost to juveniles’ constitutional rights because the due process voluntariness test independently accounts for a child’s youth. To be sure, that test permits consideration of a child’s age, and it erects its own barrier to admission of a defendant’s inculpatory statements at trial. See Gallegos, 370 U. S., at 63-55; Haley, 332 U. S., at 599-601 (plurality opinion); see also post, *281 at 297 (“[Cjourts should be instructed to take particular care to ensure that [young children’s] incriminating statements were not obtained involuntarily”). But Miranda’s procedural safeguards exist precisely because the voluntariness test is an inadequate barrier when custodial interrogation is at stake. See 384 U. S., at 458 (“Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice”); Dickerson, 530 U. S., at 442 (“[Rjeliance on the traditional totality-of-the-circumstanees test raise[s] a risk of overlooking an involuntary custodial confession”); see also supra, at 268-270. To hold, as the State requests, that a child’s age is never relevant to whether a suspect has been taken into custody — and thus to ignore the very real differences between children and adults — would be to deny children the full scope of the procedural safeguards that Miranda guarantees to adults.
* * *
The question remains whether J. D. B. was in custody when police interrogated him. We remand for the state courts to address that question, this time taking account of all of the relevant circumstances of the interrogation, including J. D. B.’s age at the time. The judgment of the North Carolina Supreme Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

It is so ordered.

 Although the State suggests that the “record is unclear as to who brought J. D. B. to the conference room, and the trial court made no factual findings on this specific point,” Brief for Respondent 3, n. 1, the State agreed at the certiorari stage that “the SRO [school resource officer] escorted petitioner” to the room, Brief in Opposition 8.

 The North Carolina Supreme Court noted that the trial court’s factual findings were “uncontested and therefore . . . binding” on it. In re J. D. B., 363 N. C. 664, 668, 686 S. E. 2d 135, 137 (2009). The court described the sequence of events set forth in the text. See id., at 670-671, 686 S. E. 2d, at 139 (“Immediately following J. D. B.’s initial confession, Investigator DiCostanzo informed J. D. B. that he did not have to speak with him and that he was free to leave” (internal quotation marks and alie rations omitted)). Though less than perfectly explicit, the trial court’s order indicates a finding that J. D. B. initially confessed prior to DiCostan-zo’s warnings. See App. 99a.
Nonetheleoo, both portico’ oubmicoiono to this Court suggest that the warnings came after DiCostanzo raised the possibility of a secure custody order but before J. D. B. confessed for the first time. See Brief for Petitioner 5; Brief for Respondent 6. Because we remand for a determination whether J. D. B. was in custody under tire proper analysis, the state courts remain free to revisit whether the trial court made a conclusive finding of fact in this respect.

 J. D. B.’s challenge in the North Carolina Supreme Court focused on the lower courts’ conclusion that he was not in custody for purposes of Miranda v. Arizona, 384 U. S. 436 (1966). The North Carolina Supreme Court did not address the trial court’s holding that the statements were voluntary, and that question is not before us.

 Amici on behalf of J. D. B. question whether children of all ages can comprehend Miranda, warnings and suggest that additional procedural safeguards may bo noeoGsary to protect their Miranda, rights. Brief for Juvenile Law Center et at 13-14, n. 7. Whatever the merit of that contention, it has no relevance here, where no Miranda warnings were administered at all.

 Although citation to social scionco and cognitive science authorities is unnecessary to cotabliah these eommon3enoo propositions, the literature confirms what experience bears out. See, e. g., Graham v. Florida, 560 U. S. 48, 68 (2010) (“[D]evelopments in psychology and brain science continue to show fundamental differ onceo botwoen juvenile and adult mindo”).

 See, e.g., 1 E. Farnsworth, Contracts §4.4, p. 379, and n. 1 (1990) (“Common law courts early announced the prevailing mow that a minor’s contact is 'voidable’ at the instance of the minor" (citing 8 W. Iloldsworih, History of English Law 51 (1926))); 1 D. Kramer, Legal Rights of Children § 8.1, p. 663 (rev. 2d ed. 2005) (“[W]hilo minor children have the right to acquire and own property, they are considered incapable of property management” (footnote omitted)); 2 J. Kent, Commentaries on American Law *78-*79, *90 (G. Comstock ed., 11th ed. 1867); see generally id., at *233 (explaining that, under the common law, “[t]he necessity of guardians results from the inability of infants to take care of themselves . . . and this inability continues, in contemplation of law, until the infant has attained the age of [21]”); 1 Blackstone *465 (“It is generally true, that an infant can neither aliono his lands, nor do any legal act, nor maleo a doed, nor *274 indeed any manner of contract, that will bind him”); Roper v. Simmons, 543 U. S. 551, 569 (2005) (“In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits tho3c under 18 years of age from voting, serving on juries, or marrying without parental consent”).

 Thus, contrary to the dissent’s protestations, today’s holding neither invites consideration of whether a particular suspect is “unusually meek or compliant,” post, at 289 (opinion of Auto, J.), nor “‘expandís]’” the Miranda custody analyoic, post, at 289, into a test that requires officers to anticipate and account for a suspect’s every personal characteristic, ace post, at 291-292.

 This approach does not undermine the basic principle that an interrogating officer’s unarticulated, internal thoughts are never — in and of themselves — objective circumstances of an interrogation. See supra, at 270-271; Stansbury v. California, 511 U. S. 318, 323 (1994) (per curiam). Unlike a child’s youth, an officer’s purely internal thoughts have no conceivable effect on how a reasonable person in the suspect’s position would understand his freedom of action. See id., at 323-325; Berkemer v. McCarty, 468 U. S. 420, 442 (1984). Rather than “overtur[n]” that settled principle, post, at 293, the limitation that a child’s age may inform the custody analysis only when known or knowable simply reflects our unwillingness to require officers to “make guesses” as to circumstances “unknowable” to them in deciding when to give Miranda warnings, Berkemer, 468 U. S., at 430-431.

 The State’s purported distinction between blindness and age — that taking account of a suspect’s youth requires a court “to get into the mind” of the child, whoroas taking account of a suspect’s blindness docs not, Tr. of Oral Arg. 41-42 — is mistaken. In either case, the question becomes how a reasonable person would understand the circumstances, either from the perspective of a blind person or, as here, a 13-year-old child.

 Contrary to the dissent’s intimation, see post, at 288, Miranda does not answer the question whether a child's age is an objective circumstance relevant to the custody analysis. Miranda simply holds that warnings must be given once a suspect is in custody, without “pausing] to inquire in individual cases whether the defendant was aware of his rights without a warning being given.” 384 U. S., at 468; see also id., at 468-469 (“Assessments of the knowledge the defendant possessed, based on information as to age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a eleareut fact” (footnote omitted)). That conclusion says nothing about whether age properly informs whether a child is in custody in the first place.