IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-135

No. COA20-212

Filed 20 April 2021

Surry County, No. 19 JB 46

IN THE MATTER OF D.A.H.

Appeal by the Juvenile from an order entered on 13 August 2019 by Judge Marion M. Boone in Surry County District Court. Heard in the Court of Appeals 27 January 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Vanessa N. Totten, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Jillian C. Katz, for the Juvenile.*

JACKSON, Judge.

¶ 1     The issue in this case is whether a juvenile is entitled to *Miranda* warnings prior to being interrogated by his school principal, when the school resource officer ("SRO") is present but does not ask questions. Because we conclude that the trial court relied on an improper legal test in determining that the juvenile was not entitled to *Miranda* warnings, we reverse and remand this matter for further proceedings.

## I.     Factual and Procedural Background

¶ 2     This matter arises from a series of events that occurred at Gentry Middle

School in Mount Airy, North Carolina during March 2019. On 11 March 2019, Deputy William Sechrist—who acted as the SRO at Gentry Middle School—was informed by school personnel that a student, Daniel,[1] had been found with marijuana on the school bus. The school bus driver had observed Daniel holding a small netted bag containing a leafy substance. The bus driver handed over the bag to Deputy Sechrist, who recognized the substance as marijuana. Deputy Sechrist then escorted Daniel to the principal's office and called Daniel's father.

Once inside the principal's office, Daniel "asked to speak freely," but Deputy Sechrist told him to "wait until your daddy gets here." Once Daniel's father arrived, Daniel told Deputy Sechrist the details of how he obtained the marijuana. Daniel explained that the previous weekend, he had contacted a fellow student—13-year-old Deacon—via Snapchat asking to buy some marijuana. Daniel and Deacon then met up in the school locker room on the morning of March 11, and Deacon gave Daniel a small bag of marijuana in exchange for $25. Deputy Sechrist performed a field test on the substance, which confirmed that the substance was 0.7 grams of marijuana.

Deacon was absent from school the following two days (March 12 and 13) and the record contains no indication that the school or the deputy took any efforts to contact Deacon or his guardian during this time. On 14 March 2019, Deacon

---

[1] Pseudonyms are used to protect the privacy of the juveniles.

reappeared in class and was summoned to the principal's office. When Deacon arrived at the principal's office, both Principal Whitaker and Deputy Sechrist were present. Deputy Sechrist was in uniform, and Principal Whitaker was wearing a suit and tie. Principal Whitaker and Deputy Sechrist sat together on one side of the table, facing Deacon. At the time that Deacon arrived, his guardian had not been told that Deacon was in the principal's office.

¶ 5        Principal Whitaker began questioning Deacon. The only evidence of what occurred during this meeting comes from the testimony of Deputy Sechrist, who offered three slightly differing accounts of how the meeting proceeded. When first asked about the meeting (on direct examination), Deputy Sechrist did not specify what precisely was asked of Deacon, but stated that Deacon "advised Mr. Whitaker he did not come to school for two days [because] he was scared he was going to get in trouble because he . . . sold marijuana to [Daniel]."

¶ 6        When asked about the meeting for a second time on cross-examination, Deputy Sechrist stated that Principal Whitaker had "asked [Deacon] to tell . . . what had taken place," and in response Deacon told them "that he had sold [Daniel] some marijuana, where he got it, and all this other stuff."

¶ 7        When asked about the meeting for a third time on redirect-examination, Deputy Sechrist described the conversation in more detail, explaining that the following exchange occurred between Deacon and Principal Whitaker:

**[Principal]:** Where have you been for the last few days?

**[Deacon]:** Well, I've been afraid to come to school I'd get in trouble [sic].

**[Principal]:** In trouble for what?

**[Deacon]:** What I sold [Daniel].

**[Principal]:** What did you sell him?

**[Deacon]:** Marijuana.

¶ 8            Deputy Sechrist stated that after this confession, Principal Whitaker called Deacon's grandmother, who arrived "probably . . . 10 minutes" after Deacon was brought into the office. He also stated that "[n]ot very many questions were even asked prior to her arrival."

¶ 9            After Deacon's grandmother arrived, the principal asked Deacon to tell his grandmother "what had taken place[,]" and Deacon repeated his statements to his grandmother. Deputy Sechrist testified that at no point was Deacon read his *Miranda* rights, told he did not have to answer their questions, nor told that he was free to leave.

¶ 10          Several months later, a juvenile petition was filed on 13 May 2019 alleging that Deacon had sold a schedule six controlled substance (marijuana) to another student in violation of N.C. Gen. Stat. § 90-95(a)(1). Deacon filed a motion to suppress on 13 August 2019, arguing that his statements to Principal Whitaker were

inadmissible as his confession was obtained in violation of his *Miranda* rights. A hearing was held on the matter that same day (13 August 2019), during which the trial court concluded that Deacon was not entitled to *Miranda* warnings because the meeting with the principal was not a custodial interrogation. In denying Deacon's motion to suppress, the trial court found and concluded in open court as follows:

> I am going to deny the Motion to Suppress. A number of things stand out to me. The officer . . . he is the SRO. He's there every day. This wasn't some strange police officer that was called to stand guard at the door. I think it's not unusual in a school setting for many or any of the children to be called to the office or principal's office. I don't think that automatically tends to turn it into a custodial interrogation. The young man was not in custody. He wasn't even questioned by the School Resource Officer, who was a daily presence there at the school. It wasn't some strange officer in a uniform.
>
> Also, another reference was made, of which I think that anybody at school would have had reason to ask, if apparently [Deacon] was out of school. Because the officer said that [Deacon] . . . told the principal he didn't come to school for two days because he was scared he would get in trouble for selling marijuana. I don't know that any officer would ever even ask: Why didn't you come to school? But a principal certainly would or should ask if a child's been absent from school.
>
> Therefore, I don't see that it was outside the scope of anything. I think that was certainly, regardless of who was in the room or not, a proper question. And that's what it sounds like it was in response to: Why weren't you in school the past two days? Well, I didn't come to school the past two days because I was afraid I'd get in trouble for selling marijuana to [Daniel].

> So I don't see this as a custodial interrogation. And
> the motion is denied.

¶ 11 Deacon was ultimately adjudicated delinquent for the sale and delivery of marijuana. In adjudicating Deacon delinquent, the trial court relied on Deacon's confession that he had sold marijuana to Daniel, as well as Daniel and Deputy Sechrist's hearing testimony that the substance sold was marijuana.

¶ 12 A disposition order was not entered within 60 days after entry of the adjudication order, so, pursuant to N.C. Gen. Stat. § 7B-2602, Deacon entered notice of appeal within 70 days from entry of the adjudication order. The trial court ordered on 25 October 2019 that disposition was stayed pending resolution of Deacon's appeal.

## II. Analysis

¶ 13 On appeal, Deacon argues that the trial court erred in denying his motion to suppress because his statements were the product of a custodial interrogation and made without *Miranda* warnings or the additional protections of N.C. Gen. Stat. § 7B-2101. Deacon further argues that the trial court's error was prejudicial and not harmless beyond a reasonable doubt. As explained below, we hold that the trial court's order fails to apply the appropriate legal principles, and we must remand this matter to the trial court for additional proceedings.

### A. Standard of Review

¶ 14 Our review of a trial court's order on a motion to suppress is "strictly limited

to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "Legal conclusions, including the question of whether a person has been interrogated while in police custody, are reviewed de novo." *In re K.D.L.*, 207 N.C. App. 453, 456, 700 S.E.2d 766, 769 (2010). Under de novo review, this Court "considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *In re A.K.D.*, 227 N.C. App. 58, 60, 745 S.E.2d 7, 8 (2013) (citation omitted).

## B. Motion to Suppress—Legal Background

### 1. *Juvenile Miranda Rights*

This case presents a unique issue regarding the nature and extent of a juvenile's right to receive *Miranda* warnings in the context of a school interrogation. *Miranda* rights stem from the Fifth Amendment of the United States Constitution, which guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The basic holding of *Miranda v. Arizona* instructs that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized" and thus "[p]rocedural safeguards must be employed." *Miranda v. Arizona*, 384 U.S. 436, 478,

(1966).

It is well-established that juveniles, just like adults, are entitled to receive *Miranda* warnings prior to in-custody interrogations in order to protect their right against self-incrimination. *In re Gault*, 387 U.S. 1, 55 (1967). *See also K.D.L.*, 207 N.C. App. at 457, 700 S.E.2d at 770 ("In order to protect the Fifth Amendment right against compelled self-incrimination, suspects, including juveniles, are entitled to the warnings set forth in *Miranda v. Arizona* prior to police questioning.").

In addition to the rights mandated by *Miranda*, in North Carolina our General Assembly "has established statutory protections for juveniles" who face custodial interrogation. *In re L.I.*, 205 N.C. App. 155, 158, 695 S.E.2d 793, 797 (2010). Specifically, under N.C. Gen. Stat. § 7B-2101,

> [a]ny juvenile in custody must be advised prior to questioning:
>
> (1) That the juvenile has a right to remain silent;
>
> (2) That any statement the juvenile does make can be and may be used against the juvenile;
>
> (3) That the juvenile has a right to have a parent, guardian, or custodian present during questioning; and
>
> (4) That the juvenile has a right to consult with an attorney and that one will be appointed for the juvenile if the juvenile is not represented and wants representation.

N.C. Gen. Stat. § 7B-2101(a)(1)–(4) (2019).

The Juvenile Code provides for even greater protections if the juvenile who is interrogated is younger than 16:

> When the juvenile is less than 16 years of age, no in-custody admission or confession resulting from interrogation may be admitted into evidence unless the confession or admission was made in the presence of the juvenile's parent, guardian, or attorney. If an attorney is not present, the parent, guardian, or custodian as well as the juvenile must be advised of the juvenile's rights as set out in subsection (a) of this section; however, a parent, guardian, or custodian may not waive any right on behalf of the juvenile.

*Id.* § 7B-2101(b). In this respect, "our General Statutes codify and *enhance* the protections required under *Miranda*." *In re J.D.B.,* 363 N.C. 664, 668, 686 S.E.2d 135, 138 (2009) (emphasis added), *rev'd and remanded sub nom. J.D.B. v. North Carolina,* 564 U.S. 261 (2011). However, the protections of *Miranda* and § 7B-2101 are only triggered when the juvenile is subjected to a custodial interrogation. *In re A.N.C.,* 225 N.C. App. 315, 319, 750 S.E.2d 835, 838 (2013). In other words, "the general *Miranda* custodial interrogation framework is applicable to section 7B-2101." *In re K.D.L.*, 207 N.C. App. at 458, 700 S.E.2d at 770.

In general, a custodial interrogation occurs when "questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* (internal marks and

citation omitted). This inquiry has traditionally been broken down into a two-part test: (1) whether the suspect was in custody; and (2) whether the statement was made in the context of an interrogation. *See id.*

As for the custody element, the basic test is "whether a reasonable person in the position of the defendant would believe himself to be in custody or that he had been deprived of his freedom of action in some significant way." *State v. Greene*, 332 N.C. 565, 577, 422 S.E.2d 730, 737 (1992). This element is viewed objectively from the standpoint of a reasonable observer. *Stansbury v. California*, 511 U.S. 318, 323 (1994). As for the interrogation element, an interrogation occurs when the authorities use "any words or actions" that they "should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). This element "is also determined objectively" with reference to the "totality of the circumstances." *In re K.D.L.*, 207 N.C. App. at 458, 700 S.E.2d at 770.

### 2. *Juvenile* Miranda *Rights in the Context of the Schoolhouse*

The questioning of juveniles in the context of the schoolhouse presents unique *Miranda* considerations. First, it should be noted that *Miranda* "does not automatically apply to *all* government actors"—rather, it only applies to interrogations conducted by (or in concert with) law enforcement officers. *Id.* at 459, 700 S.E.2d at 771. For example, a student simply being questioned by a principal would not generally qualify as a custodial interrogation, but a student questioned by

an SRO certainly could. *See id.* Second, the schoolhouse is a unique forum because "schoolchildren inherently shed some of their freedom of action when they enter the schoolhouse door," given educators' need "to control the school environment." *Id.* (internal marks and citation omitted). Due to the constraints inherent in the schoolhouse environment, we have held that a child is only under custodial interrogation when "he is subjected to additional restraints beyond those generally imposed during school." *Id.*

¶ 22    The first case to fully articulate this heightened schoolhouse standard was *In re K.D.L.*, 207 N.C. App. at 454, 700 S.E.2d at 768. There, after a 12-year-old student was discovered with marijuana in the classroom, he was taken to the assistant principal's office. *Id.* The SRO arrived at the assistant principal's office, briefly spoke with the juvenile, frisked him to search for weapons, and then transported the juvenile in his patrol car to the principal's office (which was located in a separate building). *Id.* Once in the principal's office, the SRO remained present while the principal questioned the juvenile. *Id.* The juvenile first denied that the marijuana was his, but eventually confessed. *Id.* All in all, the juvenile was questioned "for about five or six hours" by the principal and "was not permitted to leave for lunch." *Id.* at 455, 700 S.E.2d at 768. The questioning began around 9:00 a.m., but the juvenile's mother was not contacted until around 3:00 p.m. *Id.* The juvenile later filed a motion to suppress, which was denied by the trial court. *Id.* at 455, 700 S.E.2d

at 768-69.

¶ 23    On appeal, we held that the juvenile's confession "should have been suppressed" as it was obtained in violation of his *Miranda* rights. *Id.* at 456, 700 S.E.2d at 769. We noted that "despite the decreased level of freedoms in schools," we still must not "forget that police interrogation is inherently coercive—particularly for young people." *Id.* at 459, 700 S.E.2d at 771. We emphasized that the State "has a *greater* duty to protect the rights of a respondent in a juvenile proceeding than in a criminal prosecution." *Id.* at 460, 700 S.E.2d at 771 (internal marks and citation omitted).

¶ 24    We concluded that the juvenile's statements were made during a custodial interrogation because "a reasonable person in his situation would believe he was functionally under arrest." *Id.* at 461, 700 S.E.2d at 772. As for the custody element of the *Miranda* test, we relied on the following factors to conclude that the juvenile was in custody: (1) the juvenile "knew he was suspected of a crime" and was "accused of drug possession"; (2) he "was interrogated for about six hours"; (3) the interrogation occurred "generally in the presence of an armed police officer"; (4) the juvenile "was frisked by that officer and transported in the officer's vehicle" to the principal's office; and (5) "at no point was there any indication that [the juvenile] was free to leave." *Id.* We reasoned that these occurrences went beyond "the usual restraints generally imposed during school" and instead were closer to those that would "likely [be]

experienced by an arrestee." *Id.*

As for the interrogation element of the *Miranda* test, we first noted that this was a "unique situation because [the SRO] did not ask any questions." *Id.* Nevertheless, we concluded that an interrogation had occurred because

> [the SRO's] conduct significantly increased the likelihood [the juvenile] would produce an incriminating response to the principal's questioning. His near-constant supervision of [the juvenile's] interrogation and "active listening" could cause a reasonable person to believe [the principal] was interrogating him in concert with [the SRO] or that the person would endure harsher *criminal* punishment for failing to answer.

*Id.* Thus, because the juvenile had "made his confession in the course of custodial interrogation without being afforded the warnings required by *Miranda* and section 7B-2101(a), and because he was not apprised of and afforded his right to have a parent present," we held that the trial court erred in denying the motion to suppress. *Id.* at 462, 700 S.E.2d at 773.

Another prominent recent case addressing the issue of schoolhouse interrogations was *In re J.D.B.,* 363 N.C. at 668, 686 S.E.2d at 138 (2009). There, a 13-year-old student was called into the principal's office after he was found in possession of a stolen camera. *Id.* at 665-66, 686 S.E.2d at 136. Present in the room were the assistant principal, the SRO, and an investigator employed by the local police force. *Id.* Prior to the meeting, the juvenile was not given a *Miranda* warning,

and was not offered the opportunity to speak with a parent. *Id.* During the approximately 30 to 45 minute interview, the assistant principal repeatedly urged the juvenile to "do the right thing" and "tell the truth," and the investigator informed him that he knew about the stolen cameras. *Id.* at 666-67, 686 S.E.2d at 136-37. The juvenile ultimately confessed to having stolen the cameras, and these incriminating statements later resulted in an unsuccessful motion to suppress by the juvenile. *Id.* at 666-68, 686 S.E.2d at 137.

¶ 27 When the case reached the North Carolina Supreme Court, the Court held that no *Miranda* warning was necessary because no custodial interrogation had occurred. *Id.* at 670, 686 S.E.2d at 139. The Court based its holding on the fact that the SRO participated only minimally in the questioning; the juvenile was not restrained or locked in the room; and the juvenile appeared to have participated willingly. *Id.* The Court specifically declined to consider the juvenile's "age and his status as a special education student" in reaching its holding, explaining that these factors were not an appropriate part of the objective test under *Miranda*. *Id.* at 671-72, 686 S.E.2d at 139-40.

¶ 28 The United States Supreme Court disagreed, however, granting certiorari to review whether "a child's age would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 271-72 (2011) (internal marks and citation omitted). The

Court ultimately reversed and remanded the case, after determining that a child's age *should* be a relevant consideration in a custody analysis. *Id*. at 281.

The Court began by noting the "inherently compelling pressures" of custodial interrogation—a risk which is "all the more acute" when the subject is a juvenile. *Id*. at 269 (internal marks and citation omitted). Observing that "children generally are less mature and responsible than adults," the Court went on to note that minors also "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them." *Id*. at 272 (internal marks and citation omitted). Specific to law enforcement interrogations, "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go," the Court observed. *Id*. And in many cases, "the custody analysis would be nonsensical absent some consideration of the suspect's age." *Id*. at 275.

The Court considered the school setting to present just such a situation. *Id*. In the school setting, "[n]either officers nor courts can reasonably evaluate the effect of objective circumstances that, by their nature, are specific to children without accounting for the age of the child subjected to those circumstances[,]" the Court reasoned. *Id*. at 276. The Court went on to note that

> the effect of the schoolhouse setting cannot be disentangled from the identity of the person being questioned. A student—whose presence at school is compulsory and whose disobedience at school is cause for disciplinary action—is in a far different position than, say, a parent

> volunteer on school grounds to chaperone an event[.] . . .
> Without asking whether the person questioned in the
> school is a minor, the coercive effect of the schoolhouse
> setting is unknowable.

*Id.* at 276 (internal marks and citation omitted).

¶ 31        Accordingly, the Court found that considering a child's age was perfectly consistent with the objective nature of the *Miranda* test. *Id.* The Court cautioned that while "a child's age will [not] be a determinative, or even a significant, factor in every case," in many cases it is "a reality that courts cannot simply ignore." *Id.* at 277. Thus, the Court ultimately held that "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test." *Id.* at 277.

¶ 32        Another prominent decision in our juvenile *Miranda* caselaw was *In re D.A.C.*, 225 N.C. App. 547, 741 S.E.2d 378 (2013). There, officers were investigating gunshots that had been fired into a home when they encountered a juvenile in the yard across the street. *Id.* at 548, 741 S.E.2d at 379. The juvenile's father came outside and encouraged the juvenile "to go with the officers and to be truthful." *Id.* The officers asked the juvenile if he would speak with them and they received an affirmative response. *Id.* They walked with the juvenile to the corner of the yard, about "ten feet outside the home, where they talked for about five minutes." *Id.* They all stood at

arms' length from each other, and though both officers were armed, "neither of them touched or made any movement towards their weapons at any point." *Id.* at 548-49, 741 S.E.2d at 380. However, the officers never expressly told the juvenile that he was free to leave or that he did not have to answer their questions. *Id.*

¶ 33    After the officers asked the juvenile whether he had fired the shots, the juvenile confessed. *Id.* at 549, 741 S.E.2d at 380. The juvenile later filed a motion to suppress his confession for violation of his *Miranda* rights, which was denied by the trial court. *Id.* On appeal, we held that the trial court acted properly because the juvenile was not subjected to a custodial interrogation while speaking with the officers. *Id.* at 550, 741 S.E.2d at 380. "A careful analysis of the totality of the circumstances surrounding the making of [the] Juvenile's statement clearly indicate[d] . . . that [he] was not subject to the degree of restraint inherent in a formal arrest[,]" we reasoned. *Id.* at 552, 741 S.E.2d at 382. We relied on the fact that (1) the officers "asked him to step outside, rather than instructing him to do so"; (2) the juvenile did nothing more than "answer a simple, straightforward question" posed to him by the officers; (3) during the conversation, all three participants "were standing and remained at arm's length from each other"; (4) the conversation occurred "in broad daylight," "in an open area in [the juvenile's] own yard with his parents nearby"; and (5) the conversation only lasted for about five minutes. *Id.* at 553, 741 S.E.2d at 382.

¶ 34          Finally, *In re R.P.*, 216 N.C. App. 585, 718 S.E.2d 423, 2011 WL 5185568 (2011) (unpublished), demonstrates how this Court has addressed cases that fail to properly apply the standard from *J.D.B.* There, a high-school student filed a motion to suppress an incriminating statement he made to an SRO, but his motion was denied by the trial court. *Id.* at *1-2. On appeal, we discussed the decisions in both *In re K.D.L.* and *J.D.B.*, noting that under then-current North Carolina *Miranda* law, we were required to consider both (1) whether the student had been subjected to restraints that go beyond "the limitations that are characteristic of the school environment in general," and (2) how "the juvenile's age and experience" might factor into the custodial question. *Id.* at *3 (internal marks and citation omitted). However, because the trial court failed to issue a written order, and because the trial transcript left us "unable to discern whether the trial court considered the juvenile's age in accordance with the United States Supreme Court's mandate in *In re J.D.B.*," we concluded that it necessary to remand the matter for further fact-finding. *Id.* at *4.

### 3. *Clarifying the Juvenile Custodial Interrogation Test*

¶ 35          Today we harmonize our prior opinions on this issue in light of the United States Supreme Court's holding in *J.D.B.* and the holdings of our sister courts in other states. There can be no doubt that educators and law enforcement are increasing their collaboration in the school setting and that school officials are increasingly becoming active participants in the criminal justice system. While

potentially warranted for both the educational and safety needs of our children, this cooperation must be consistent with the Fifth Amendment's guarantee against self-incrimination. As the United States Supreme Court recognized in *J.D.B.*, the Fifth Amendment requires that minors under criminal investigation be protected against making coerced, inculpatory statements, even when—and perhaps, in some cases, particularly because—they are on school property. *J.D.B.*, 564 U.S. at 275. Increased cooperation between educators and law enforcement cannot allow the creation of situations where no *Miranda* warnings are required just because a student is on school property.

¶ 36      To that end, we believe that one aspect of the schoolhouse *Miranda* test is particularly deserving of an in-depth review here—namely, the extent of the SRO's involvement in the interrogation. On one end of the custodial spectrum, it is near-universally agreed that a meeting solely between a student and school officials generally will not qualify as a custodial interrogation. *See In re K.D.L.*, 207 N.C. App. at 459, 700 S.E.2d at 771 (noting that *Miranda* "does not automatically apply to *all* government actors"—rather, it only applies to interrogations conducted by, or in concert with, law enforcement officers); *D.Z. v. State*, 100 N.E.3d 246, 247 (Ind. 2018) ("[W]hen school officials alone meet with students, a clear rule governs: *Miranda* warnings are not required."); Martin R. Gardner, *Removing Miranda from School Interrogations*, 99 NEB. L. REV. 16, 30 (2020) ("If there is no law enforcement

involvement, then there is no custody and no *Miranda* applicability.").

¶ 37 On the other end of the spectrum, an interview that features heavy SRO involvement or direction will often qualify as a custodial interrogation. *See, e.g., In re R.H.*, 568 Pa. 1, 4-8, 791 A.2d 331, 332-35 (2002) (holding that *Miranda* warnings should have been given where a student was removed from class by an SRO and interrogated by the officer for 25 minutes, and where the interrogation "ultimately led to charges by the municipal police, not punishment by school officials pursuant to school rules").

¶ 38 Then there are cases between those two ends of the spectrum—cases like the present one—where the SRO is present while the juvenile is questioned by school officials but does not participate in the questioning, or where the SRO participates minimally in the questioning. We hold that circumstances such as these can indeed qualify as custodial interrogations where *Miranda* warnings are required. As discussed above, in *In re K.D.L.*, we held that *Miranda* warnings were required even when the SRO remained silent throughout the juvenile's interview. *See In re K.D.L.*, 207 N.C. App. at 461, 700 S.E.2d at 772 (holding that a custodial interrogation had occurred—despite the fact that the SRO "did not ask any questions"—because the SRO's "near-constant supervision" of the interrogation and "active listening" throughout might "cause a reasonable person to believe" that the principal was interrogating the juvenile "in concert with" the SRO).

¶ 39 Today we reaffirm this principle. We agree that when a student is interrogated in the presence of an SRO—even when the SRO remains silent—the presence of the officer can create a coercive environment that goes above and beyond the restrictions normally imposed during school, such that a reasonable student would readily believe they are not free to go. This holding recognizes the "reality that courts cannot simply ignore"—that juveniles are uniquely susceptible to police pressure and may feel compelled to confess when a reasonable adult would not. *J.D.B.*, 564 U.S. at 277.

¶ 40 Moreover, this holding is consistent with the decisions of other state appellate courts. Since the time *In re K.D.L.* was decided in 2010, several other state appellate courts have approved of this rationale—recognizing that oftentimes the presence of an SRO during schoolhouse questioning can transform what otherwise might appear to be a voluntary encounter into a custodial interrogation. *See, e.g., N.C. v. Commonwealth*, 396 S.W.3d 852, 854-62 (Ky. 2013) (holding that *Miranda* warnings were required when the SRO was "present throughout" the juvenile's interrogation by the principal—despite the SRO's minimal involvement in the questioning—because "[n]o reasonable student . . . would have believed that he was at liberty to remain silent, or to leave" under the circumstances); *State v. Antonio T.*, 352 P.3d 1172, 1179-80 (N.M. 2015) (holding that the SRO's "mere presence during [the principal's] questioning of [the juvenile] converted the school disciplinary interrogation into a criminal investigatory detention," because the SRO's presence

"created a coercive and adversarial environment that does not normally exist during interactions between school officials and students"); *B.A. v. State*, 100 N.E.3d 225, 229-34 (Ind. 2018) (holding that although the officers "did not directly question" the juvenile during his interrogation by the principal, nevertheless the "consistent police presence" throughout the interview "would place considerable coercive pressure on a reasonable student in [the juvenile's] situation" and required the provision of *Miranda* warnings).

Thus, we reiterate that the presence of an SRO (or other law enforcement officer) while a student is interrogated by a school official weighs heavily on the scale when determining whether what otherwise might appear to be a voluntary encounter is instead a custodial interrogation. However, we also note that the involvement of an SRO in the questioning is a factor which is relevant, *but is not by itself dispositive*, to the question of whether the encounter between a child and a school official is a custodial interrogation. We still must look to all of the remaining *Miranda* factors to determine if any statements the student makes were the product of a custodial interrogation.

*a. Custody*

The first element of the *Miranda* test asks whether the juvenile was in custody. As explained by the United States Supreme Court,

[W]hether a suspect is in custody is an objective inquiry. Two discrete inquiries are essential to the [custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.

. . .

Rather than demarcate a limited set of relevant circumstances, we have required police officers and courts to examine all of the circumstances surrounding the interrogation, including any circumstances that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave.

*J.D.B.*, 564 U.S. at 270-71 (internal marks and citation omitted).

¶ 43    After thoroughly reviewing the caselaw from this state, the United States Supreme Court, and persuasive authority from other jurisdictions, we conclude that the following factors are most relevant in determining whether a juvenile is in custody in the context of a schoolhouse interview:

   (1) traditional indicia of arrest;

   (2) the location of the interview;

   (3) the length of the interview;

   (4) the student's age;

   (5) what the student is told about the interview;

   (6) the people present during the interview; and,

(7) the purposes of the questioning.

First—was the student subjected to any of the traditional indicia of arrest? If the student was handcuffed, transported in a police car, subjected to a search of his or her person or belongings, or otherwise bodily restrained, then this is a strong indication that the student was in custody. *See, e.g., In re K.D.L.*, 207 N.C. App. at 461, 700 S.E.2d at 772 (juvenile was in custody when he was "frisked by [the] officer and transported in the officer's vehicle to [the principal's] office," as this is a type of restraint that is "more likely experienced by an arrestee" than a student); *State v. Buchanan,* 353 N.C. 332, 339, 543 S.E.2d 823, 828 (2001) ("Circumstances supporting an objective showing that one is 'in custody' might include a police officer standing guard at the door, locked doors, or application of handcuffs."); *B.A.*, 100 N.E.3d at 232 ("On the other end of the [custody] spectrum lie armed and uniformed police officers who pull students from class in handcuffs before questioning them.").

Second—where was the interview held? If the interview was conducted in a location that a reasonable child might consider confining, this tends to show that the child was in custody. *See, e.g., State v. Doe*, 130 Idaho 811, 818, 948 P.2d 166, 173 (1997) ("We think it unlikely that the environment of a principal's office or a faculty room is considered by most children to be a familiar or comfortable setting, for students normally report to these locations for disciplinary reasons[.]"). On the other hand, if the interview was held in a location where a child is likely to feel comfortable

and at-ease, this tends to show that the child was not in custody. *See, e.g., In re D.A.C.*, 225 N.C. App. at 553, 741 S.E.2d at 382 (holding that no custody occurred because "instead of being involved in a closed door conference room with police and an assistant principal, [the] juvenile was questioned in an open area in his own yard with his parents nearby") (internal marks and citation omitted). Other relevant considerations include the size of the room, whether the door was closed or locked, and the child's familiarity with that specific location.

¶ 46 Third—how long was the interview? A long, drawn-out questioning tends to show that the child was in custody, whereas a very brief questioning does not. *Compare In re K.D.L.*, 207 N.C. App. at 461, 700 S.E.2d at 772 (juvenile was in custody where he "was interrogated for about six hours, generally in the presence of an armed police officer") *with In re D.A.C.*, 225 N.C. App. at 553, 741 S.E.2d at 382 (juvenile was not in custody when "the conversation between Juvenile and the investigating officers . . . lasted for about five minutes"). Other relevant considerations include whether the child was offered a place to sit, and whether the child is offered common courtesies such as food, water, or bathroom breaks. *See State v. Hammonds*, 370 N.C. 158, 164, 804 S.E.2d 438, 443 (2017) (suspect was not in custody when "the detectives offered [him] food or drink" and bathroom breaks were made available).

¶ 47 Fourth—how old was the student? As explained by the United States Supreme

Court in *J.D.B.,* younger children are far more "vulnerable or susceptible to outside pressures" than older children or adults. *See J.D.B.*, 564 U.S. at 272 (internal marks and citation omitted). Thus, the younger the student, the more sensitive the student will be to circumstances that could be coercive—"[s]o long as the child's age was known to the officer at the time of the interview, or would have been objectively apparent to any reasonable officer." *Id.* at 274. *Compare Doe*, 130 Idaho at 819, 948 P.2d at 174 (holding that it was "unlikely that any ten-year-old would feel free to simply leave" when questioned by an SRO or school authorities); *with J.D.B.*, 564 U.S. at 277 (explaining that "teenagers nearing the age of majority" are unlikely to feel the same coercive pressures as younger children) (internal marks and citation omitted).

¶ 48        Fifth—what was the student told about the interview? If the student is informed that he or she is free to leave, that answering questions is not required, or is offered the opportunity to call a parent or guardian, then this tends to show that the student was not in custody. *See, e.g., In re Hodge*, 153 N.C. App. 102, 108, 568 S.E.2d 878, 882 (2002) (juvenile was not in custody when the detective "prefaced her interview with [the juvenile] by saying, 'you don't have to talk to me,' 'I am not going to arrest you'"). On the other hand, if the student is not informed about the nature of the interview, and is not told whether his or her presence is compulsory or voluntary, this weighs in favor of the conclusion that the student was in custody. *See*

*In re K.D.L.*, 207 N.C. App. at 461-62, 700 S.E.2d at 772-73 (juvenile was in custody where he "knew he was suspected of a crime," and there was "no suggestion anything transpired that would cause him to believe he was free to leave"). And of course, a student is certainly in custody if he or she is expressly told not to leave.

Sixth—who all is present during the interview? If the student is questioned in the presence of multiple SROs or other law enforcement officers, or even by numerous school officials, this tends to show that the student was in custody. *See, e.g., B.A.*, 100 N.E.3d at 232 (considering the "number of officers present and how they are involved" as a key step in custody analysis). On the other hand, if a parent, guardian, or other person who can advocate for the child (such as a guidance counselor), is present or nearby during the interview, this suggests a reasonable child would not have felt coerced. *Compare In re D.A.C.*, 225 N.C. App. at 553, 741 S.E.2d at 382 (juvenile was not in custody when he was "questioned in an open area in his own yard with his parents nearby"); *with Doe*, 130 Idaho at 818, 948 P.2d at 173 (juvenile was in custody when "[n]o parent or other adult concerned with Doe's best interest was present during the questioning").

Seventh—what were the objectively apparent purposes of the interview? In other words, was the interview primarily a criminal investigation or primarily a school disciplinary matter? *See Antonio T.*, 352 P.3d at 1179 ("Questioning a child for school disciplinary matters is distinguishable from questioning a child for

suspected criminal wrongdoing."); *N.C.*, 396 S.W.3d at 865 (explaining that even "when law enforcement is involved" in the questioning of a student, *Miranda* warnings are not necessary "if the matter purely concerns school discipline"). If the interview was the result of specific criminal suspicion directed toward the student, questioning occurring during the investigation of this suspicion will be subject to closer scrutiny by courts. *See In re D.A.C.*, 225 N.C. App. at 552, 741 S.E.2d at 382 (holding that "the degree to which suspicion had been focused on the defendant" prior to the interview is a relevant *Miranda* factor) (internal marks and citation omitted); *In re K.D.L.*, 207 N.C. App. at 461, 700 S.E.2d at 772 (interview was custodial when juvenile "knew he was suspected of a crime" as opposed to a mere violation of school rules). On the other hand, if the interview is a disciplinary investigation into the breaking of school rules and its result is unlikely to involve the criminal justice system, questioning of the student will not be considered to have occurred while the student was in custody. *See, e.g., Matter of Phillips*, 128 N.C. App. 732, 735, 497 S.E.2d 292, 294 (1998) (no *Miranda* warnings required when school officials "did not question the juvenile to obtain information to use in criminal proceedings but questioned her simply for school disciplinary purposes").

¶ 51        The purpose of an interview (criminal vs. disciplinary) can also be revealed by examining the degree and nature of the cooperation between school officials and law enforcement, including an SRO. Did the SRO work with the school official by

following a set of pre-defined procedures in conducting the interview? For example, if school officials typically follow a certain process when disciplining a child for breaking school rules, and use a different process when investigating criminal activity, then the use of (or departure from) these procedures is instructive. *See, e.g., N.C.*, 396 S.W.3d at 854 (evidence showed that student was in custody when principal and SRO had employed a "loose routine they followed for questioning students when there was suspected criminal activity").

### b. *Interrogation*

¶ 52        The second element of the *Miranda* test asks whether the juvenile was subject to an interrogation. Under this element, the primary concern is whether the authorities employed "any words or actions" that they "should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. The focus here is on "the suspect's perceptions" of the encounter, "rather than on the intent of the law enforcement officer." *State v. Golphin*, 352 N.C. 364, 406, 533 S.E.2d 168, 199 (2000).

¶ 53        In the context of a schoolhouse interrogation, the following factors are most relevant to the interrogation element:

> (1) the nature of the questions asked (interrogative or mandatory);
>
> (2) the willingness of the juvenile's responses; and,
>
> (3) the extent of the SRO's involvement.

First—what was the nature of the statements made by the questioner? If the questions were mostly open-ended (e.g., "would you like to tell me what happened?"), this weighs against concluding that the questioning was an interrogation. *See, e.g., In re D.A.C.*, 225 N.C. App. at 553, 741 S.E.2d at 382 (juvenile was not subject to custodial interrogation when he was "asked . . . rather than instruct[ed]" to cooperate, and "did nothing more . . . than answer a simple, straightforward question"). On the other hand, if the questions are accompanied by imperative statements suggesting compliance is mandatory (e.g., "you have to tell me the truth"), this supports the conclusion that the questioning was an interrogation. *See, e.g., In re K.D.L.*, 207 N.C. App. at 462, 700 S.E.2d at 773 (juvenile was subject to custodial interrogation when he was not "given *the option* of answering questions," but rather was instructed to answer). The tone of voice, volume, and body language used by the questioner are also relevant here. *See Hammonds*, 370 N.C. at 164, 804 S.E.2d at 443 (no custodial interrogation when the conversation with the suspect was "calm and cordial in tone" and "the detectives offered [the suspect] food or drink").

Second—how willingly did the subject respond to the questions? If the juvenile makes a wholly unsolicited or spontaneous statement, such a statement is unlikely to be considered to have been made in the context of interrogation. *See In re D.L.D.*, 203 N.C. App. 434, 444, 694 S.E.2d 395, 403 (2010) (no custodial interrogation occurred when juvenile's "unsolicited and spontaneous" statement was "not [made] at

the questioning of the officers") (internal marks and citation omitted). On the other hand, if a juvenile expresses hesitancy or reluctance to answer, claims ignorance of a subject, or must be coaxed into answering, this weighs in support of the ultimate conclusion that any statements made occurred during an interrogation.

Third—what was the extent of the involvement of law enforcement? As discussed above, a custodial interrogation can occur even when the SRO is present while a student is interviewed by school officials but does not ask questions. However, the scope and extent of the SRO's involvement in the questioning is still a relevant factor in ascertaining whether or not an interrogation occurred. If the SRO was not present for the entirety of the questioning or for significant portions of it, the absence of the officer can weigh against the conclusion that the questioning qualified as an interrogation. *See In re R.B.L.*, 242 N.C. App. 383, 776 S.E.2d 363, 2015 WL 4429626, at *1-8 (2015) (unpublished) (juvenile was not subject to custodial interrogation when the SRO "stood off to [the] side," did not ask questions, and "entered and exited the room several times" during the interview). On the other hand, if the SRO directs the questioning, either by leading it or participating heavily in it, this weighs in support of the conclusion that the questioning was an interrogation. *In re K.D.L.*, 207 N.C. App. at 461, 700 S.E.2d at 772.

Finally, we note that as with the reasonable adult standard, no single factor is controlling in determining whether statements made by a juvenile are the product of

custodial interrogation. Rather, the inquiry is whether the totality of the circumstances surrounding the questioning "add up to custody." *J.D.B.*, 564 U.S. at 278 (citation omitted).

## C. Application

¶ 58        Now we turn to the facts of the present case and the issue of whether the statements Deacon made were the product of a custodial interrogation. To briefly review, 13-year-old Deacon was called into to the principal's office after officers received a tip that Deacon had sold marijuana to another student. He was then questioned by the principal while the SRO was present the entire time, and after some prompting made a confession. It was not until after Deacon made this confession that his guardian was contacted, and at no point was he told that he was free to leave or to refuse to answer questions. We hold that this amounted to a custodial interrogation and that the trial court erred in concluding otherwise and denying the motion to suppress.

### 1. *Custody*

¶ 59        First—would a reasonable student in Deacon's place have felt free to terminate the interview and leave, under these circumstances? We conclude that a reasonable 13-year-old would not, given the location of the interview, what Deacon could have known about the interview before it began, the people present during the interview, and the investigatory purpose of the interview.

¶ 60        Thirteen-year-old Deacon arrived at school on the morning of 14 March 2019 knowing that he was in trouble—knowing that his classmate had recently been caught with the marijuana that Deacon had sold him. In fact, he had been absent from school the prior two days because he was so nervous about what might happen when he returned. His worries were confirmed when he was summoned to the principal's office that morning, where both Principal Whitaker and Deputy Sechrist were waiting for him. The two authority figures sat together opposite Deacon. Deputy Sechrist was wearing his uniform, and Principal Whitaker was dressed formally in a suit. Deacon was not told that he was free to go, was not told that he did not have to answer questions, and was not told that he could call his grandmother if he wished.

¶ 61        We hold that, under these circumstances, no reasonable 13-year-old would have felt free to leave. Even before any questions were asked, it appeared that this interview was for purposes of a criminal investigation rather than a mere disciplinary matter. Deacon's classmate Daniel had been caught with marijuana only three days prior, and had admitted that he bought the drugs from Deacon. Deputy Sechrist and Principal Whitaker were thus following a lead as a part of a criminal investigation when they called Deacon into the office to be questioned.

¶ 62        The State contends that this was purely a disciplinary matter (and that no *Miranda* warning was required) because Principal Whitaker was only concerned with

why Deacon had missed school the previous two days. While it is true that Deacon had missed school for two days, if this had been a pure disciplinary matter regarding Deacon's absences, then there would have been no reason to have the SRO present. Though the record does not demonstrate what typical procedures Gentry Middle School follows when a student has accrued two days' worth of absences—absences which might not have been unexcused[2]—we strongly suspect that not every instance involves a student being summoned out of class to meet with the principal and a uniformed SRO.

¶ 63     Moreover, once inside the principal's office—an intimidating atmosphere to any reasonable 13-year-old—Deacon found himself in a room not only with the principal, but also the same officer that had questioned Daniel. A reasonable student in Deacon's position would believe that he was going to be questioned about potential criminal behavior, not disciplined for missing two days of school. Accordingly, we hold that Deacon was in custody at the time of his questioning by Principal Whitaker and Deputy Sechrist.

### 2. Interrogation

¶ 64     We must next address whether Deacon was subjected to interrogation—i.e., whether the questioning was of a nature that the two authority figures should have

---

[2] Deputy Sechrist admitted at the suppression hearing that he did not know whether Deacon's absences were unexcused.

known was likely to elicit an incriminating response from Deacon. We conclude that the answer to this question is also yes, given the nature of the questions asked, the length of the interview, the extent of Deputy Sechrist's involvement, and the differential treatment of Deacon as compared to Daniel.

¶ 65    After Deacon arrived at the principal's office, he began to be questioned by Principal Whitaker, while Deputy Sechrist sat by the principal's side and observed throughout. However, Deputy Sechrist's testimony regarding the content of the interview was not exhaustive. He offered three slightly differing accounts of what happened: (1) initially testifying that Deacon apparently volunteered the information about the marijuana sale without being prompted; (2) then clarifying that Principal Whitaker had asked Deacon to tell them "what had taken place," whereupon Deacon confessed; and (3) finally stating that Principal Whitaker had simply asked Deacon "where have you been for the last few days," to which Deacon responded that he had skipped school for fear of being punished for the marijuana sale.

¶ 66    Though it is not clear precisely what questions Principal Whitaker asked Deacon, it *is* clear that Deacon's grandmother was not contacted until after Deacon had already confessed in response to the questioning. Deputy Sechrist also stated that "not very many questions were even asked" prior to the grandmother being called—but the very phrasing of this statement implies that multiple questions were asked before Deacon's guardian was notified, and that enough were asked to elicit a

confession. Under these circumstances, both Principal Whitaker and Deputy Sechrist should have known that asking these questions of a 13-year-old (who was already the suspect of a criminal investigation and likely knew he was a suspect, and who had not yet been afforded any ability to contact his guardian), would have been likely to result in an incriminating statement.

¶ 67 We also cannot ignore the fact that Deacon received a very different treatment than his classmate Daniel. After Daniel was found with marijuana on the school bus, he was escorted by Deputy Sechrist to the principal's office, and his father was immediately contacted. Once inside the principal's office, Daniel asked whether he could "speak freely," but Deputy Sechrist expressly instructed him to "wait until your daddy gets here." Daniel was not asked any questions until after his father arrived.

¶ 68 In contrast, Deacon was not advised to keep quiet until his guardian arrived, and Deacon's guardian was not even contacted until after he had confessed. This unequal treatment underscores that the purpose of interviewing Deacon was to conduct a criminal investigation, not to investigate whether he had broken a school rule about absences. Unlike Daniel, Deacon did not have access to a guardian or other adult concerned with his best interest during the questioning, demonstrating that the purpose of the questioning was to elicit an inculpatory response from a criminal suspect, rather than to mete out school discipline for missing class.

¶ 69 As the State notes, it is true that Deputy Sechrist himself asked no questions

of Deacon during the interview, based on Deputy Sechrist's testimony. However, as in *In re K.D.L.*, Deputy Sechrist's presence during the entirety of the interview "significantly increased the likelihood" that Deacon "would produce an incriminating response to the principal's questioning." 207 N.C. App. at 461, 700 S.E.2d at 772. Moreover, we find it relevant that Deputy Sechrist was intimately involved in the investigation from the outset. He investigated the original incident on the bus, escorted Daniel to the principal's office, warned Daniel not to speak prior to his father arriving, and was present throughout Daniel's questioning. Prior to speaking with Deacon, Deputy Sechrist had also performed lab tests on the substance recovered from Daniel to confirm it was marijuana. On the day of questioning Deacon, Deputy Sechrist was in uniform, he sat on the same side of the desk as the principal, and was present for the entire interview. Under these circumstances, Deputy Sechrist was more than just an observer to a school disciplinary conversation—he was a law enforcement officer investigating a crime.

¶ 70        Finally, we note that the trial court relied on an erroneous legal standard in concluding that Deacon's interview was not a custodial interrogation. The trial court based its determination primarily on the "fact" that Deputy Sechrist was not "some strange officer in uniform" and that it was "not unusual in a school setting" for a student "to be called into a principal's office." This is not the test for whether a *Miranda* warning is required.

¶ 71        First, aside from the fact that there was no evidence in the record to support the finding that Deputy Sechrist was not a "strange officer in uniform," it bears emphasizing that the *Miranda* inquiry is an *objective*, not subjective, test. *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004). Any supposed familiarity between a 13-year-old and an investigating officer is irrelevant under a proper *Miranda* inquiry. *Id.* at 668-69 (relying on a suspect's "prior history with law enforcement" in a *Miranda* analysis is "improper" because "[t]he inquiry turns too much on the suspect's subjective state of mind and not enough on the objective circumstances of the interrogation") (internal marks and citation omitted).

¶ 72        Rather, the objective *Miranda* inquiry turns on (1) "the circumstances surrounding the interrogation"; and (2) whether "given those circumstances," a reasonable 13-year-old would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The circumstances here were that Deacon, a 13-year-old suspect in a criminal investigation, was called out of class to be questioned in the principal's office alongside the SRO; was neither told he was free to leave nor that he did not have to answer questions; and was not provided the option of contacting his guardian until after he had already confessed.

¶ 73        The trial court was required to take these circumstances into account to determine whether a reasonable 13-year-old in Deacon's position would have felt free

to terminate the encounter and leave. There is no indication in the trial court's order that it considered or applied this standard. Accordingly, the trial court erred in denying the motion to suppress Deacon's confession; in concluding that the questioning did not amount to a custodial interrogation; and in concluding that Deacon was not entitled to the protections of the Fifth Amendment or N.C. Gen. Stat. § 7B-2101.

## III.  Conclusion

The trial court erred in concluding that Deacon's confession was not the product of a custodial interrogation and in denying the motion to suppress Deacon's confession. We therefore reverse and remand the order of the trial court.

REVERSED AND REMANDED.

Judges HAMPSON and CARPENTER concur.